[Howard v. The State.]

# Howard *v.* The State.

## *Murder.*

(Decided April 18, 1911. 55 South. 255.)

1. *Criminal Law; Venue; Evidence.*—Since the court judicially knows of the location of incorporated towns, as to the counties in which they are situated, proof that a crime was committed in the town of Andalusia is sufficient proof of the. venue in Covington County.

2. *Same; Insanity; Evidence.*—Insanity is an affirmative defense which must be established to the reasonable satisfaction of the jury.

3. *Homicide; Insanity; Jury Question.*—Where an accused in a homicide case went upon the stand and testified as to the facts of the crime, the question of his sanity was one for the jury although the defense introduced substantial evidence tending to show that the defendant was insane, which was not replied to by the State, since insanity is a defense which must be established to the reasonable satisfaction of the jury, and the evidence of the defendant while on the stand was evidence from which the jury could determine his sanity vel non.

4. *Same; Evidence.*—Where the question is sanity or insanity, every act of the party's life becomes relevant to the issue.

5. *Same.*—Statements made by a defendant after the commission of the homicide are admissible on the issue of his sanity or insanity at the time of the commission of the crime.

6. *Same; Threats.*—The evidence of the defendant that he sought out the deceased and demanded a retraction of a slander concerning his sister, and that deceased refused to retract and threatened to kill deceased advancing upon him with a hammer in his hand, and that defendant while retreating shot the deceased, tended to establish a case of self-defense, and. rendered admissible evidence that the deceased had at a time prior to the difficulty threatened to kill the deceased, as having a tendency to show the animus of the attack ,even though the threat had not been communicated to the defendant.

7. *Trial; Limiting Evidence.*—Where certain evidence was otherwise inadmissible, but was admissible on the issue of insanity, it was proper for the court to direct the jury to regard that evidence only on the issue of insanity.

APPEAL from Covington Circuit Court.

Heard before Hon. H. A. PEARCE.

J. Finley Howard was convicted of murder in the second degree, and he appeals. Reversed and remanded.

W. H. SAMFORD, J. MORGAN PRESTWOOD, ALBRITTON & ALBRITTON, and HENRY OPP, for appellant. The bare presumption of sanity is not sufficient to support a conviction in the face of competent and uncontradicted evidence to the contrary.—*Utah v. Brown,* 24 L. R. A. 545; *Harris v. N. C. & St. L. Ry.,* 153 Ala. 139; *Central of Ga. Ry. Co. v. Foshee,* 125 Ala. 109. It is therefore insisted that the court should have instructed the jury to acquit the defendant. The court erred in limiting the evidence to the question of insanity.—*Ames v. State,* 73 Ala. 498; *Gafford v. State,* 122 Ala. 54.

ROBERT C. BRICKELL, Attorney General, and W. L. MARTIN, Assistant Attorney General, for the State.

SOMERVILLE, J.—The defendant was tried on an indictment charging him with the unlawful killing of George Bagley, with malice aforethought. He pleaded, "Not guilty," and also, "Not guilty by reason of insanity," and upon the issues thus made and joined the defendant was found guilty of murder in the second degree, and sentenced for a term of 15 years.

1. The defendant requested in writing the general affirmative charge that, if the jury believed the evidence in the case, they should find the defendant not guilty. The charge was refused, and error is imputed on the theory that there was no evidence as to the venue of the crime. W. S. Hart, a witness for the state, testified that "he (the deceased Bagley) died in my shop in the county and in the town of Andalusia;" and he and other witnesses testified that Bagley's wounds from which he died were inflicted in this same shop. We judicially know that Andalusia is in Covington county; and hence no other proof of the venue was necessary.

2. The defendant also requested in writing the general affirmative charge that, if the jury believed the evi-

dence in the case, they should find the defendant *not guilty by reason of insanity.* This charge was refused, and it is vehemently insisted for the defendant that its refusal was erroneous; the contention being that the initial presumption of the sanity of the defendant was fully met and completely overthrown by the direct and positive evidence of his insanity, introduced on behalf of the defendant, in rebuttal of which the state offered no evidence at all, choosing—to quote the language of counsel—to treat the issue of insanity "with silent and cynical contempt." The question thus presented has not heretofore been considered by this court; and among all the reported cases we find but a single instance in point. It is therefore open to us to inquire whether, on reason and principle, such an instruction on such an issue may, in any case, be properly given by the court to the jury; and, if so, whether it should have been given in the present case.

The evidence introduced for the defendant tended to show very strongly, if not conclusively, that Mrs. Bagley, the wife of the deceased, had circulated reports imputing to defendant's sister, who lived with and was dependent upon him, a want of chastity, and that she had several times aspersed defendant's character to a young woman to whom he was engaged to be married, and warned her not to keep his company, and that these facts had been communicated to defendant. That the deceased had affirmed the accuracy of his wife's statements, had insulted defendant's sister in a personal conversation with her, and threatened to kill defendant if she told him about it, of all of which, except the threat, she had informed defendant. That, under the stress of this situation, which continued for some time, defendant became nervous, irritable, and morose, and finally determined to secure a retraction of the injurious charges, and to stop their further circulation.

According to the defendant's own testimony, he went to see the deceased at about 9 o'clock on the morning of the killing, with a view to getting him to go with him to see Mrs. Bagley and help in the settlement of the trouble, which the deceased declined to do; and, an hour or two later, being advised thereto by a friend, he repeated his visit to deceased, at the shop where he worked, with the same request; and it was then that the altercation ensued, during which defendant fired the three pistol shots, resulting in Bagley's almost immediate death.

Defendant's father testified that defendant was a pale, nervous boy, and always of a melancholy disposition, though he had seen him only once or twice in the two or three years preceding this killing; that defendant's mother, several months before his birth, fell down the porch steps and suffered serious injury, which confined her in bed for five months; that thereafter she became nervous and irritable and a physical wreck; and, though she lived 25 years longer, she went from bad to worse, and finally died insane. The witness also testified that an aunt of his wife died in a hospital, violently insane, and that a younger brother of defendant is weak-minded, violent at times, and requires the care of an attendant.

Two physicians, Drs. Broughton and Lightfoot, testified from personal knowledge to the abnormality of defendant's mother, and agree that she suffered from the form of insanity known as paranoia. They stated, from protracted personal observation of the defendant, that in their opinion he had from infancy suffered from paranoia, a disease of the brain, and productive of insanity in a greater or less degree, though often intermittent in its character; that defendant was peculiar, eccentric, and morose, and easily excited and provoked

to the verge of insane acts; that he was morbidly sensitive where his honor was involved; that his condition would often render him unable to distinguish right from wrong in particular cases; and that, from their personal knowledge of his ancestry, his mental and physical constitution, and the traits he exhibited, coupled with the exciting and provoking incidents shown by the evidence, they were of the opinion that, at the time of the act of killing Bagley, he either did not know the moral nature of the act, or was unable to refrain therefrom, and that the act was the product solely of his mental condition.

We are referred by appellant's counsel to but a single authority dealing with the precise question here involved, and we have been able to find no other. The case is that of *State v. Brown* (Utah) 102 Pac. 641, reported also in 24 L. R. A. (N. S.) 545. We do not feel justified in presenting here an exhaustive review of this case, but, for the purpose of comparison, we briefly epitomize the facts and conditions which the Utah court held to be a sufficient predicate for a peremptory instruction to the jury in favor of the defendant, on the issue of insanity.

The defendant, Brown, about 30 years old, was charged with the forgery of a bank check, which act was not disputed by him before or during the trial. On the trial no attempt was made by him to explain or extenuate the act; his sole reliance being on his plea of insanity. We infer that *he did not testify at all before the jury.* A paternal great-grandmother, great-grandfather, and aunt, besides the father himself, had all been insane. Although earlier he had been mentally alert and competent in business affairs, for several years previous to this forgery he exhibited numerous mental vagaries and hallucinations, many of them be-

ing of the most fantastic character. The defendant's conduct and declarations in relation to the forgery, as narrated by witnesses for the state, were well calculated in themselves to cast doubt upon his mental integrity, as the opinion points out. To quote from the opinion: "The witnesses, *14 in number,* among whom were business men, lawyers, police officers, county attorney, and court officers, *all* were of one mind that the defendant, *at the time of the alleged offense,* was mentally unbalanced, did not know or realize the consequences of his act, and that his state of mind was such that he did not know the nature and quality of the act with which he was charged, and that he did not know or realize that the act was wrong. * * * Some of the witnesses laid special stress upon the incoherent character of his conversations, and upon his apparent inability to think and talk in a connected manner."

The rationale of the conclusion reached is thus stated: "In this case, as we have pointed out, the evidence of defendant's mental unsoundness before, at the time of, and after the commission of the alleged offense is all one way. It comes from a class of witnesses who had ample opportunities to observe defendant's acts and conduct. Many of them knew him a long term of years, and thus from time to time noted the change in his mental condition. Moreover mental unsoundness —that is, insanity—is shown as a part of defendant's family history. The insane temperament is thus shown to have existed. Among the witnesses were men who came in contact with crime and criminals almost daily, and as a part of their official duties, and thus could not be easily deceived. It was also shown that but few of all those witnesses had any special interest in the defendant. It is not a case where the testimony was limited to the friends of the family or relatives of the de-

fendant, who sought to shield the family from disgrace; but it is a case where a large number of witnesses, without any apparent interest or bias, all agree that . the defendant before, at the time of, and after the commission of the alleged offense was, and continued to be, insane, and that he was mentally irresponsible. Under such circumstances, can it be said, with any show of reason, that there is any evidence in support of defendant's sanity?" The opinion discusses the question of the burden of proof at some length, and says: "When, however, he (defendant) has offered sufficient competent evidence to overcome this presumption (of sanity), the state must, nevertheless, establish his sanity beyond a reasonable doubt, for the reason that, wherever intent is an essential ingredient of the crime charged, this intent, to constitute the act a crime, must be shown."

This is not the rule in Alabama, where insanity is treated as an affirmative defense, which must be established to the reasonable satisfaction of the jury.—*Martin v. State,* 119 Ala. 1, 25 South. 255. To what extent this doctrine may have influenced the decision of the court, we are unable to judge. Without approving it, we are not disposed to criticise the correctness of the decision in the *Brown Case,* as applied to the facts shown. In fact, we agree with the observation of the editor of the L. R. A., in his note appended thereto (24 L. R. A. [N. S.] 545), that, although the theory of the decision is sound, "the question does not, and in fact cannot, arise frequently. It is almost inconceivable that there would be no evidence at all to show sanity, or, at least, that a case would go beyond the trial court, if the prosecution has nothing but the bare presumption of sanity on which to base its claim that the defendant was sane, and consequently responsible for his acts."

[Howard v. The State.]

But there are decisive distinctions between the *Brown Case,* and the case we are here considering: First, the antecedent conduct and declarations of the defendant were there thoroughly indicative of actual insanity, and perhaps responsible men could not differ as to the conclusion; second, all of the 14 witnesses testified, from more or less intimate acquaintance and *prolonged personal observation* of the defendant, that he was undoubtedly insane and irresponsible *at the time of* the forgery; and, third, there was apparently nothing before the jury to rebut the great mass of testimony directly showing actual insanity before, at the time of, and after the act in question.

In the present case, while predisposing causes and favorable symptoms are not wanting, and are even abundant, yet no witness expresses the opinion that defendant was insane prior to, or independently of, the circumstances of the provocation leading up to the homicide. His father says no more than that he was a pale, delicate boy from birth, and disposed to be melancholic. Nor do the two physicians, who testify as experts, undertake to directly say, from their own ample acquaintance and observation alone, that he was at any time, by the mere force of cerebral disease, a victim of settled insanity. As we interpret their testimony, as bearing upon the defendant's mental condition *at the time of the homicide,* it presents only their opinion or belief that his general mental instability, with its hereditary genesis, as actually known to them, acted upon by numerous exciting causes, which are hypothesized, would produce a condition of mental inability to understand the nature of the act, or to refrain from its commission. This may be strongly persuasive; but it can hardly be said to be conclusive. But, be this as it may, there were facts before the jury from which opposing inferences might be rationally drawn by them.

[Howard v. The State.]

The defendant testified on the witness stand in his own behalf, and his recital of the slanderous wrongs done his sister by the wife of the deceased, contumaciously shared in by deceased himself; of the personal insult to his sister offered by deceased; of the interference with defendant's matrimonial prospects; and his complete narrative of the res gestae of the homicide itself—all afforded a fruitful opportunity to the jury to form an estimate of his mental condition. It exposed to their view, in some measure at least, the operations of his mind, his perception of the right relation of things, his self-restraint under great provocation, and perhaps an intelligent effort to adjust his conduct to the requirements of the law of self-defense. We do not mean to say that, even so, he may not have been legally insane. Indeed, we are deeply sensible of the significance of his unhappy nativity, and of the hereditary incubi which, in view of his delicate physical constitution, may well have cast for him in infancy a gloomy horoscope. We only mean to say that there was before the jury substantial evidence from which they might rationally infer that defendant's mental infirmities did not obscure his intelligence, nor destroy his free agency, in relation to the act with which he stands charged, and the issue was properly submitted to the jury.

In inquiries as to sanity or insanity, it has been said that "every act of the party's life is relevant to the issue."—1 Greenl. on Ev. (16th Ed.) p. 58. So statements of the defendant, made after the homicide, are competent to show the condition of his mind.—*Braham v. State,* 143 Ala. 28, 39, 38 South. 919. And, in general, his acts, declarations, and conduct.—*McCurry v. Hooper,* 12 Ala. 823, 46 Am. Dec. 280.

In *McAllister v. State,* 17 Ala. 434, 438, 52 Am. Dec. 180, pertinent to the question under discussion, this

court said: "The opinion, too, of medical men is by no means binding on the jury, even when they have had the most ample opportunity to observe the character and phenomena of this disease. * * * But it is now settled that the opinions of medical men may be admitted as evidence to be weighed by the jury; but, if the *whole* evidence does not satisfy their minds that insanity existed at the time the act was done, they should find the prisoner guilty, although the medical witnesses were of the opinion that the prisoner was insane." And to the same effect is *Watson v. Anderson,* 13 Ala. 202. This view was reaffirmed in the case of *Braham v. State,* 143 Ala. 42, 38 South. 924, where it was declared that "the jury is not concluded by the opinions given by experts on the question of sanity vel non, and, while the court pronounces upon the competency of witnesses as experts, it is .the province of the jury to measure the weight of their opinions"—citing *McAllister v. State, supra.*

We are referred to the case of *Harris v. Nashville, etc., R. R. Co.,* 153 Ala. 139, 44 South. 962, 14 L. R. A. 261, as furnishing a striking analogy in support of appellant's contention. The distinctions, however, are obvious; for in that case the testimony of the engineer as to the best means for quickly stopping a moving train was not opposed by any presumption of law to the contrary, and, more especially, because the testimony related to "a scientific question, rather than one of common knowledge, * * * and that there is no room for the exercise of common knowledge as against the *undisputed* testimony of an expert."—153 Ala. 143, 44 South. 964. While here we have both the opposing presumption, and also a subject-matter involving the application of common knowledge, and as to which non-expert witnesses may testify, as well as technical experts.

3. The defendant testified that, at the time he shot and killed Bagley, the latter was advancing to attack him, first with a rasp or file, and afterwards with a hammer, which attack was prefaced with a threat to kill, and that defendant was retreating as he fired. His testimony, if believed, legitimately tended to make out a case of self-defense. Upon this issue, and on these facts, evidence of the fact that Bagley had recently threatened to kill the defendant, although not communicated to him, was admissible to show the quo animo of the demonstration or attack; and also, if it was doubtful who commenced the affray, as tending to show who was probably the first assailant.—*Roberts v. State*, 68 Ala. 156, 164; Greenl. on Ev. (16th Ed.) p. 55. And, being in evidence, it was manifest error for the trial court to instruct the jury to disregard it, as was done in the charge ex mero motu.

But, as to those parts of the evidence which were admissible on the issue of insanity, and inadmissible on the general issue of guilt vel non, it was proper for the court to instruct the jury to consider such evidence only upon the issue to which it was legally appropriate.

For the error above pointed out, the judgment must be reversed, and the cause remanded.

Reversed and remanded.

SIMPSON, ANDERSON, and SAYRE, JJ., concur.