154 So. 575

## BOYLE v. STATE.
### 6 Div. 365.

Supreme Court of Alabama.
May 10, 1934.
Rehearing Denied June 29, 1934.

For other cases see same topic and KEY NUMBER in all Key Number Digests and Indexes

Bowers & Dixon and Borden Burr, all of Birmingham, for appellant.

Thos. E. Knight, Jr., Atty. Gen., and Thos. Seay Lawson, Asst. Atty. Gen., for the State.

BOULDIN, Justice (after stating the facts as above).

A grave question presented on this appeal is whether the defendant was due an affirmative instruction on his plea of "not guilty by reason of insanity."

The burden and measure of proof of insanity in such cases is defined by statute (Code·1923, § 4572) as follows: "Every person over fourteen years of age charged with crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury."

This statute was enacted in 1889 (Acts 1888–89, p. 742, § 1), the session following the famous decision in Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am. Rep. 193, defining the legal test of responsibility for crime, when a plea of insanity is presented.

In Boswell v. State, 63 Ala. 307, 317, 35 Am. Rep. 20, opinion by Stone, J., the former decisions of this court, as well as decisions of English and other American courts, were reviewed; among them the McNaghten Case (10 Cl. & Fin. 200), wherein Lord Ch. J. Tindall answered for the Judges of England questions propounded by the British House of Lords, saying: "* * * that the jury ought to be told, in all cases, that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary is proved to their satisfaction; and that to establish a defense on the ground of insanity, it must be clearly proved, that, at the time of committing the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."

In the Boswell Case the court took occasion to criticize and condemn "moral" or "emotional insanity," as distinguished from "irresistible impulse" resulting from mental disease. In conclusion the court held "that insanity is a defense which must be proven to the satisfaction of the jury, by that measure of proof which is required in civil cases."

In Ford v. State, 71 Ala. 385, 392, the rule of the Boswell Case was restated in the following words: "* * * *insanity* is a defense which must be established *to the satisfaction of the jury, by a preponderance of the evidence.*"

Chief Justice Brickell dissented in both the Boswell and Ford Cases.

In Parsons' Case, supra, the rule was restated in the same language as in the Ford Case.

We are impressed the wording of our statute, "clearly proved to the reasonable satisfaction of the jury," was chosen with studied care, having in mind the test of responsibility

222

defined in the Parsons Case, and also the warnings of Chief Justice Stone in his dissenting opinion in that case.

■ We are not, however, impressed that the statute contemplates a taking from the trial court the responsibility and duty to give instructions as in other cases where a presumption must be overcome. The affirmative charge, with hypothesis (if the jury believe the evidence), may properly be given for the state on clear and undisputed evidence of guilt, notwithstanding the strong presumption of innocence, to be overcome by proof beyond a reasonable doubt.

■ Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form.

■ But courts should be careful not to invade the province of the jury in cases of this character. Although the evidence may be offered only by the defense, and all tend to one conclusion, yet, in view of the presumption of sanity, if the evidence is inconclusive, and reasonable inferences may be drawn that the act was that of a sane man as defined by law, the affirmative charge should be refused.

This is but to apply the oft-stated general rule defining the functions of court and jury. We see no sound reason to devise a different rule in insanity cases. The inherent difficulties in considering such issue apply to the jury, the same as the court. Howard v. State, 172 Ala. 402, 55 So. 255, 34 L. R. A. (N. S.) 990.

The test of responsibility where the defense of insanity is set up in a criminal case is defined in the Parsons Case, supra, and consistently followed in all subsequent cases. The inquiries are thus stated:

"First. Was the defendant at the time of the commission of the alleged crime, as matter of fact, afflicted with *a disease of the mind*, so as to be either idiotic, or otherwise insane?

"Second. If such be the case, did he know right from wrong, as applied to the particular act in question? If he did not have such knowledge, he is not legally responsible.

"Third. If he did have such knowledge, he may nevertheless not be legally responsible if the two following conditions concur:

"(1) If, by reason of the duress of such mental disease, he had so far lost the *power to choose* between the right and wrong, and to avoid doing the act in question, as that his free agency was at the time destroyed; (2) and if, at the same time, the alleged crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it *solely*." 81 Ala. 596, 597, 2 So. 854, 866, 60 Am. Rep. 193.

This statement of the law is so exact, clear, and inclusive as that no comment is needed, save to call attention to the words stressed by the court by italics.

It is the application of this law to the facts of the case that brings responsibilities and difficulties of gravest sort.

But little question is or can be raised to the fact that this defendant did slay his mother in a manner almost unthinkable in its horror.

He is a most atrocious criminal or else the hopeless victim of a diseased mind; on the one hand deserving of sorest punishment, or on the other of intense sympathy, and that care which a humane civilization provides.

Sensible of our limitations, we proceed to consider tendencies of the evidence in so far as appear pertinent to the legal questions we are called upon to decide.

First. Heredity. Without dispute insanity, and intermarriage of relatives, appear in defendant's ancestry.

Evidence of psychiatrists goes to the effect that a predisposition to insanity may be expected. Moreover, the evidence both of lay witnesses and experts, without dispute, discloses this defendant did have the inborn qualities of an ego-eccentric introvert, manifested in manner and disposition set out in the hypothetical question above.

In addition to what is there said by the psychiatrists, in connection with heredity, we quote the following from Herzog's Medical Jurisprudence, § 631: "In many cases there is nothing to indicate what may have caused either a slow development of the psychosis or its sudden outbreak, but in other cases certain events occurring in the life of an individual act as the exciting causes. If life runs smoothly a person predisposed to insanity may escape it, but if such a person is upset by business troubles, loss of sleep due to financial worries, sickness of a dear one, some sudden calamity, excessive study, worry over one's health * * * he may be the victim of a sudden outbreak of insanity stimulated by any one of these things."

Second. Financial worries. Without dispute defendant became involved in debts he was unable to meet; indebted to his bankers and his brokers in large amounts past due, behind with his law firm, his income about gone, properties incumbered, etc. Keeping in mind his intense pride in his business and social position, we advert to the changes

which many witnesses say began to develop in his conduct and manner.

It was spring and summer of 1932.

Bold assurances to his family as well as friends that the depression had not touched him; talk of fine cars and trips abroad; invention of a fictitious client, giving name and character of work, at $400 per month; promises of $40,000 to come from New York, of $9,000 to come from Montgomery, etc.

Common experience reminds us that promises which cannot be met, and dissembling as to income and holdings, may be devices to keep up appearances, stay off creditors, a moral rather than a mental breakdown, even where in fair weather the party had been quite prompt and reliable in all engagements.

But when these matters are persisted in by a party who, unless unbalanced, knows such course is then, or immediately will be, known to be false, and so only discredit him the more, the question of insane delusions begins to arise. For example, a declaration that a large check was in hand, and would be used next morning to clear up matters, all a mere hoax, to become apparent on the morrow, seems abnormal.

Add to this, as time progressed, a virtual abandonment of his business, avoiding his business associates, a moody, aimless standing around, staring into vacancy, exhaustion, falling asleep at unaccustomed hours; all this in a man with an ego-eccentric complex appears quite clearly from the evidence to have led his friends and associates to suspect something mentally wrong.

We note the alleged delusions of prosperity were associated with the crisis in his affairs threatening his standard of living, his social and business standing, the things in which his life centered. Were these insane delusions thrown up as a kind of bulwark against despair?

Following this lead, namely, a crisis in the life of a man predisposed to insanity, how did his mother figure in the picture?

The evidence on no point is so full, clear, and unquestioned as that of the intense devotion of the son to his mother, manifested in affectionate deferential manner, love of her companionship, solicitude for her health and happiness.

He handled her business, knew the financial crisis upon him reached to her, her property and income. That he kept this from her is indicated not only by his constant assurances to his wife, but also by the fact that when Elizabeth, his wife, mentioned to his mother the apprehensions of friends, the mother reassured the wife that all was well with John. That this only son was the chief object of the mother's affections is not to be questioned. Her will, drawn by him for her, argues she thought she had an estate of substantial value.

We think it wholly improbable that she realized the legacies she was willing her sister and other relatives would consume the estate, or comparatively reduce the residuary bequest to her son. The son, while at himself, must have seen all this. If so, is it not natural to infer the mother's relation to the financial crisis entered into and became one with his own, as affecting the mental strain, which in turn was probably related to the delusions and other demeanor prior to the homicide?

Suddenly, on a day in June, while together on an outdoor drive in which the mother delighted, and at a quiet, but not fully hidden, spot on the mountain, the mother is slain with all the harrowing details shown in evidence.

It is manifest the psychiatrists, and probably the lay witnesses, look upon the killing, the gruesome manner of it, and its accompanying incidents, as the final confirming evidence of insanity, when linked back with the other matters above discussed.

There are some four phases of the testimony which seem to have been relied upon by the state to weaken the probative force of the opinion evidence, and other supporting facts. Briefly, we may summarize them thus.

1. Defendant was not insane at any time before in his life. The alleged delusions, with change of appearance and demeanor, are inconclusive, and loom larger after the event.

2. He was not found insane on careful examination by psychiatrists after the event. This is admitted by them. Dr. Heacock, aided by prior knowledge of the man, and seeing him on the evening of the homicide, is an exception; Dr. Rudolph also.

3. Evidence of conscious guilt in framing up a story laying the crime to another, including the infliction of wounds on his own person in corroboration.

4. A motive growing out of the will made by his mother.

Dealing first with this fourth proposition, it is without dispute that the son was the only heir. His inheritance, on the mother's death, would be greater without the will than with it. If there was a murder to come into present possession of desired property, the will could add nothing to such prospect. He already had control of her property by full con-

sent. There is an entire want of evidence of any displeasure on the part of the son because of the terms of the will; rather tends to show he was in full accord with it. The devoted relations between mother and son continued as before. If he conceived some grievance because of the terms of the will, it does not appear in any way. If he did, the question of a fancied wrong as an insane delusion of paranoiac type, directed toward a loved one of the insane, would enter into the inquiry. Unless coupled with some purpose to do away with this will, or substitute another, of which there is an entire want of evidence, no financial advantage as a motive for killing his mother can be perceived because of the existence or terms of the will.

■■ In the absence of some evidence tending to show how the existence of the will could be a motive for the crime, its admission for such purpose is questionable. But under the broad rule admitting the entire chain of events in insanity cases, there was no error in admitting the will to be considered in connection with all the circumstances in the case. In this connection, the conversation wherein defendant, while confined in jail, directed another to get the will from a designated place and turn it over to the attorney to be probated, was, we think, admissible under the wide range of inquiry in insanity cases. It would at least go to the question of memory of events and transactions antedating the homicide. Anderson v. State, 209 Ala. 36, 39, 95 So. 171, and cases there cited.

The third and second phases of evidence above listed appear to us to present the most difficult questions on the issue of insanity.

Psychiatrists express the opinion that, if wounds were inflicted on his own person to give plausibility to his story of another guilty agent, and so escape punishment, and pursuant to such purpose calmly tried to set up his story, this is some evidence that, at that time, he was conscious of either a moral or legal wrong.

But, in any event, considering the picture as a whole, they are unanimously of the opinion that defendant was subject to the duress of mental disease which, for the time, destroyed his free agency, even if he knew right from wrong in relation to the particular act.

■■ The rule is fully settled with us that opinion evidence, even of experts, and in insanity cases, is to be weighed by the jury, and its probative force in overcoming the presumption of sanity, as a rule, is for them.

Parrish v. State, 139 Ala. 16, 36 So. 1012; Anderson v. State, supra.

This does not mean, however, that the jury may arbitrarily ignore or reject such testimony. Such evidence is admitted upon the ground that men who have given great study and had much experience are more competent than the layman to form a correct opinion on the question of sanity. It is illogical to say the layman in the jury box may lightly set up his own opinion to the contrary. But the juror must determine first whether the hypotheses on which the expert opinion is based are proven in substance and effect, and then weigh the expert evidence in connection with other evidence, indulging the presumptions the law declares.

■ If the evidence in this case tends to prove that this defendant planned to murder his mother in such atrocious manner as within itself would divert suspicion from a supposedly devoted son; inflicted wounds on himself as part of a preconceived scheme to escape punishment, and with like purpose boldly proclaimed another as the guilty agent, knowing this was not true, a jury question is presented, notwithstanding no known motive appears.

■■ We hesitate to take from the jury any case where there is evidence of conscious guilt at the moment the deed was perpetrated. In saying this, we do not question the legal rule that, despite knowledge of wrongdoing as related to the act, there may be such disease of the mind as to completely destroy the power to choose. In such case, it is for the jury to say whether such disease was the sole cause of the deed.

Under these principles, the refusal of the affirmative instruction was without error. But this writer, profoundly impressed with the unanimous opinion of eminent psychiatrists, in this case, as well as the utter improbability that this son, devoted to his mother all his life, could, in a sane moment, have committed this deed, and, speaking for himself, and not for the court, feels impelled to note certain evidence in connection with the opinion evidence, and other recognized authority in Medical Jurisprudence.

The witnesses discussed different types of insanity, and seem not in entire agreement as to the class to which this case should be assigned.

Dr. Herzog, under the heading of Manic-Depressive Insanity, deals with a class of cases beginning with symptoms of monomania

or paranoia, and developing symptoms of melancholia. He says the patient in the first cycle is "pleasantly excited," has "feelings of well-being * * * great riches, and influence," etc. He then writes:

"The depressive phase is characterized by general slowing down of the impulses and thoughts of the patient with depression which may change from mild to deep melancholia, generally with delusions and sometimes hallucinations. During this stage the patient is likely to commit suicide and murder.

"The name 'circular insanity' was given to the disease because of its periodicity, or rather because an attack of mania is followed generally by a stage of depression, which is followed in turn by an interval in which the mind is, or at least seems, perfectly clear, upon which follows again mania, depression and clear interval. There are, therefore, complete recoveries from the attacks, but there is no real recovery from the disease as at any time an attack may recur." Herzog's Medical Jurisprudence, § 612.

Speaking of the victim of melancholia, the final or depressive stage, he says: "Sometimes he will fly into rages, destroying anything and anybody he can reach (raptus melancholicus), and often after such an attack will appear perfectly sane, just as if the storm of anger had destroyed all melancholia and had brought on the blue sky of sanity. Very slight or no recollection whatsoever of acts committed during the raptus melancholicus is the rule." Herzog's Medical Jurisprudence, § 610.

Cited under the above section (section 610) is the case of State v. Reidell, 9 Houst. (Del.) 470, 14 A. 550, 555, a case wherein a husband killed his wife and attempted suicide. In that case there was evidence of "the absence, not only of all remorse for his fatal act, but apparent calm satisfaction with respect to it." Most harmonious relations had always existed between husband and wife. The husband brooded over the wrongful discharge of his wife from her employment. Experts testified the absence of remorse, etc., was evidence of insanity in such case.

The evidence in this case of absolute indifference, utter want of emotion, following the commission of the deed, is in full harmony with these views of Dr. Herzog and the case cited by him as indicative of insanity.

Is there not something significant in the fact that the wounds on the body of defendant were of like kind with those on the body of his mother?

Is it to be taken for granted these wounds were inflicted with the intent to shield himself from the consequences of crime; and not in an attempt at suicide, so planned as to leave the impression that both had died at the hands of another; or the work of wild delirium, raptus melancholicus, himself the madman of his delusion?

If not unbalanced, would he inflict wounds through his undershirt alone in an effort to make evidence?

One knife wound on his neck went to the jugular vein. Was this the last one, and failed, because of exhaustion, fainting, or otherwise, to accomplish its purpose?

Why the many hours after his mother was slain, before, in apparent unconcern, he told his incredible story?

The writer, speaking for himself alone, having no expert knowledge, does not assume to answer there inquiries, but is impelled to say, after careful study of this record, that an insane killing, and attempted suicide, seems to me a probability worthy of careful consideration.

In course of argument, the assistant solicitor said: "That the effect of the finding of the defendant not guilty by reason of insanity would probably be to 'put him upon the ground.' "

Defendant's objection was overruled, and exception reserved.

Then followed this statement by the solicitor: " 'If you find this defendant not guilty by reason of insanity Dr. Partlow will be the man who will afterwards have to consider and pass upon the question of sanity.' "

Objection to this argument was overruled and exception reserved.

This line of argument was presented in Anderson v. State, 209 Ala. 36, 95 So. 171, and Bachelor v. State, 216 Ala. 356, 361, 113 So. 67. In both cases the trial court sustained the objection to such argument, and instructed the jury to disregard it. This court treated such argument as improper, holding the action of the trial court sufficient to eradicate its harmful effect.

Clearly the sole question in this connection was whether defendant was "not guilty by reason of insanity."

What might happen if he were sent to the insane asylum, instead of the penitentiary, should not have been thrown into the case to influence the verdict. The action of the trial court was an invitation to the jury to consider such contingency.

Maybe the law should provide some greater safeguards, such as a judicial inquiry, before persons found not guilty of murder by reason of insanity should be discharged from the hospital for the insane; but this should not be allowed to influence juries in trials like this. State v. Johnson, 151 La. 625, 92 So. 139.

Without considering further questions raised on the trial, the court is of opinion this conviction should not stand.

Let the judgment be reversed, and the cause remanded. The defendant will remain in custody until discharged by due course of law.

Reversed and remanded.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.