The appellant was indicted for the first degree murder of his pregnant wife. Prior to trial the appellant was ordered committed to Bryce Hospital for an investigation of his sanity pursuant to Title 15, Section 428, Code of Alabama 1940, Recompiled 1958. Approximately three months later the Forensic Evaluation Board of that hospital found that the appellant was competent to stand trial, but that he "was probably psychotic and not legally sane at the time of the alleged crime". A jury found the appellant guilty of murder in the second degree and fixed his punishment at twenty-five years' imprisonment. Both at trial and on appeal the appellant is represented by court appointed counsel. Additionally, the appellant was represented by retained counsel at trial.
The only contention presented on appeal is that it was error for the trial judge to refuse to give the affirmative charge and instruct the jury that the evidence of insanity was so clear and the proof so strong and undisputed that they were bound to accept such testimony of insanity. Because of the nature of this issue, it is important to detail the testimony of each witness bearing on this point.
On the 28th of May, 1975, the deceased was killed by a blast from a shotgun fired at a distance of less than two feet. She was found in the bathroom of the house where she and her husband, the appellant, lived. The murder weapon was found lying on the floor outside the bathroom door.
When Patrolman William C. Cater of the Birmingham Police Department arrived at the scene of the crime, the appellant drove up behind the patrol car. Officer Cater asked the appellant if he called the police and the appellant stated that he shot his wife and she was in the bathroom. Cater testified that the appellant appeared calm and answered questions for the police report.
A Jehovah's Witnesses' bible was found open on the dining room table in the house. Two empty shotgun shells were recovered from the scene. A live shell was found in the shotgun. A hole made by a shotgun blast was noticed in the ceiling of the house over the dining room table.
Detective Charles M. Melton of the Birmingham Police Department interviewed the appellant at the Birmingham City Jail on the day of the murder. During their conversation, Detective Melton made the following notes which were as close to what the appellant actually said as he could manage.
 "Last night you could hardly breathe. Wife's breath hurt him. Woke up and found himself breathing like life. I heard voices. One more thing we would have to do before we transformed into one another. Wife wanted to lay down *Page 685 
longer. Feels wife was possessed. Wife got up. Wife asked bacon or sausage. Wife put book on table. Poured orange juice. Voice told him about transition. Got gun from closet, fired one in ceiling, and then fired at wife. (Signed) Gene A. Herbert."
After reading and signing Detective Melton's notes, the appellant added the following statement in his own handwriting.
 "There are some things that happen that I feel was controlled me. I felt my wife had a control over my mind. (Initialed) G.A.H."
Detective Melton testified that the appellant was calm, that "he didn't appear to be outwardly upset and nervous". Though the appellant was carrying on a completely coherent conversation with Detective Melton, Melton did not consider the statement to be one of a rational and sane individual. Detective Melton stated that the appellant was a Jehovah's Witness and that the appellant told him that he didn't trust attorneys.
The state then rested and the appellant's records from Bryce Hospital were admitted into evidence by the defense without objection.
The defense presented the testimony of three employees of U.S. Steel Corporation who had worked with the appellant before the murder. A.B. Jones stated that he worked with the appellant on a daily basis as a wireman for the past three years. Mr. Jones testified that until about three months before May 28, 1975, the appellant was quiet, well-mannered, and very cooperative; that he read his bible a lot and was nonviolent. However, about two or three months before the murder the appellant's personality "completely changed".
 ". . . (H)e was different. He would stare. And he couldn't comprehend. He would ask you a question and you would tell him, and he couldn't comprehend it. He definitely changed * * And he would start home and then he would come back. And then he would go and come back."
The appellant got his work shifts confused and reported for work at the wrong time. Although he had previously been a good worker he had difficulty in doing his job properly. He had a "far away" look in his eyes and "would just have his eyes fixed on you and looking straight at you" but did not comprehend. During these last three months the appellant lost about forty pounds. Mr. Jones stated that he saw the appellant the day before May 28, 1975, and that in his opinion the appellant was "demented or insane".
On cross examination Mr. Jones stated that the appellant had his bible with him every day he was at work for the past two years; that he saw the appellant "sometimes maybe three, four or five times a day". The appellant had not just become "more peculiar" in his actions but had "completely changed".
Lee Alford was also an employee of U.S. Steel, had known the appellant for two years, and worked directly with him. He testified to substantially the same effect as Mr. Jones and stated that the appellant
 "got so that you would have to tell him when to move. And when he got still it was like he was in a trance or something. You would have to go touch him and tell him to move, to call him out and tell him when to move or do the work, and like that."
The appellant would stare at "something in one direction" and would go a long time without blinking his eyes. Several days before the murder Mr. Alford did the appellant's work for him because the appellant "wasn't at himself at that particular time". The appellant's eyes were glazed and he appeared to have his mind on something else. The appellant "got to where he went to getting worse and worse". Mr. Alford saw the appellant the day before the murder and in his opinion the appellant was insane.
Cross examination of Mr. Alford revealed that although the appellant had always been a quiet type individual, during those last three months *Page 686 
 "He wasn't like he was, he was in a nervous condition and just in a — just like he wasn't at hisself, like he was always in a daze."
Raymond L. Howard, Jr. was the third employee of U.S. Steel to testify for the defense. Mr. Howard described the changes in the appellant's personality occurring in a period of two to three months before May 28, 1975.
 "Well, he just was in a daze, you know, like he didn't know what he was doing or where he was at most of the time."
The appellant became confused about his working schedule and had to be told over and over again and instructed on his work shift. He was "just blank"; he "wasn't here". Mr. Howard saw the appellant just about every morning and noticed that he was acting strange "as though he wasn't even in this world". Howard suggested to Mr. Jones that someone would do the appellant a favor if they would take him to the hospital or to a doctor.
During this time the appellant lost forty or fifty pounds. In Mr. Howard's opinion, the appellant was insane.
Each of these three witnesses testified that they saw the appellant the day before the murder was committed. Each testified that, in his opinion, the appellant was insane. Expert testimony confirmed the conclusions of these lay witnesses.
Dr. Gerald Lower testified that he was employed at the Forensic Branch at Bryce Hospital. The state stipulated that he was a qualified psychologist for the State of Alabama. Dr. Lower was the chairman of the Forensic Evaluation Board.
Dr. Lower testified that when the appellant was admitted to Bryce Hospital by order of the Jefferson County Circuit Court on June 17, 1975, he was in a catatonic state.
 ". . . he would sit or stand mute; he wouldn't say anything; he wouldn't answer questions; and he would sit in strange postures and stare rigidly. And at first he, for several days, wouldn't eat. "And in general, he was just completely out of contact."
A catatonic state is a condition in which the person is out of touch with reality, not responsive to conversations and cannot be communicated with. Dr. Lower testified that typically people who are in this state do things
 "that aren't related to anything that is going on around them. And it's just as if they were shutting out the world and they are in their own world doing this posturing or this jesturing, whatever, not responding to the world around them."
A fixed stare is one of the features associated with a catatonic state. The appellant was interviewed by Dr. Lower, a staff psychiatrist and a medical doctor at Bryce Hospital.
In Dr. Lower's interview with the appellant's mother and father, he learned that the appellant was born with a "large lump" on the side of his head which eventually disappeared. According to his parents the appellant had always been "sickly" and had had headaches whenever he exerted himself.
 "He had always been very quiet and kept to himself. He was frightened of crowds. And he felt that people were trying to hurt him.
 "* * * That when he was an adolescent, when he was a young man, he never had a girlfriend, had never gone out with girls particularly until he finally married in November of 1974.
 "That the day after the wedding he got very suspicious and afraid of his wife, and believed she was trying to poison him. That he stopped eating and lost 60 pounds very rapidly.
 "* * * And his wife took him to the hospital for some tests. And he later went back and admitted himself. But then he got the idea that they were trying to harm him at the hospital — that they were trying to kill him at the hospital, rather.
 "So, he then left the hospital and went back to work."
In a history obtained from the appellant himself, during the first part of the interview *Page 687 
the appellant said "that he wasn't married and that he never had been and he thought his charges were for murder, but he didn't know who he was supposed to have murdered". When it was called to his attention that he was charged with murdering his wife the appellant "put his head in his hands and he said, `Now, I remember'". The appellant
 ". . . indicated that he had been married for about six months before the murder, and that he begin to get suspicious of his wife shortly before it happened. That he thought that his wife was — and these are his own words — `A wicked demon angel', and that he was a demon angel. And he begin to see his wife's shoes in some boxes in the car each day. And he thought that this was some kind of a ritual.
 "He also says that he heard voices that were telling him what to do. And he felt that he must obey them. And that he got a gun shortly before this because someone had tried to steal his car.
 "And let's see, that's about it. He said that he had a 12th grade education. He worked as an electrician for a number of years. And he had never been married until about six months before, has no children.
 "And he mentioned that he had attended the Smolian Clinic two years before this for a period of time.
 "And the final statement here is that he seems to have no memory for the actual murder, but does realize that `something' was wrong. And that he appeared quite depressed and quite vague about things during this interview."
At Bryce Hospital the appellant was given a number of psychological tests. Based on these tests and the different interviews with the appellant, the Forensic Evaluation Board unanimously agreed that the appellant was insane at the time the murder was committed. The appellant was diagnosed as suffering from schizophrenia-catatonic type, withdrawn, which is a mental disease. This Board was composed of two psychologists, a social worker, two medical doctors and a psychiatric nurse.
The appellant was discharged from Bryce Hospital diagnosed as "schizophrenia, catatonic type, not psychotic", which means that
 "we had cleared up the psychotic (insane) symptoms to the point where even though he still had the disease he was able to function more or less normally."
Dr. Lower further testified that the appellant had no control over this mental disease; the "tendencies are largely inherited". In his opinion, the appellant did not know right from wrong with regard to the actual killing. In his best opinion "it probably wouldn't have mattered who was there, he would have probably done it anyhow", because he thought he was killing a demon who was real to him.
Cross examination of Dr. Lower revealed the facts that the appellant was a Jehovah's Witness and that a tenant of that religion was a belief in demons; and that the appellant was committed approximately twenty days after the crime at the request of his attorney. Dr. Lower stated that it was possible to be in a catatonic state without being insane and that a person could withdraw into a catatonic state after a crime such as this, though Dr. Lower stated that he didn't believe that it happened here. The symptoms exhibited by the appellant would be pretty difficult to fake over an extended period of time. On the I.Q. tests the appellant had an overall score in the borderline retarded range but his potential abilities probably lie within the average range, the test results being affected by his emotional status. There was some evidence from the psychological tests that seemed to indicate a mild brain disease.
Dr. Lower testified that the intensity of the appellant's catatonic state varied somewhat from time to time.
On redirect examination, Dr. Lower testified in substance that the testimony of the three fellow employees of the appellant was consistent with the development and progression of the mental illness of the appellant and what these men generally described as a "stare" was probably the beginning *Page 688 
of the solid and rigid catatonic state that the appellant exhibited in the hospital. Dr. Lower further stated that people in these states "often do appear calm because they are not doing anything or saying anything".
Dr. Howard Lee Miller is a professor in psychology at the University of Alabama in Tuscaloosa teaching primarily diagnostics and psychopathology. Based upon his review of the medical records of the appellant and a personal interview with the appellant, Dr. Miller concluded that the appellant was insane at the time of the crime. He concurred with the diagnosis that the appellant was a catatonic schizophrenic throughout his stay at Bryce Hospital. Dr. Miller stated that the appellant was "clearly schizophrenic", and that the symptoms described by his three fellow workers were "undoubtedly the beginning of the catatonic phase of the disorder". Dr. Miller stated that
 ". . . it is most important to obtain a family history positive for schizophrenia, because it is almost always obtained in the case of a schizophrenic person, because there would be some history, say, within the first cousin of the family within maybe two generations back at the most."
A family history of mental illness would certainly increase the probability of schizophrenia in the appellant in Dr. Miller's opinion.
The appellant's family history revealed that his grandfather
 "was apparently hospitalized for some five years for what appeared to be a schizophrenia like disease; his two cousins were hospitalized; and a paternal uncle has been hospitalized for some 30 years with what appeared to be schizophrenia."
Dr. Miller testified that the evidence of the appellant's schizophrenia in his file was "voluminous".
 "There were notes from at least a half a dozen people at the beginning of his hospitalization attesting to a very typical withdrawn catatonic behavior. "He was apparently so far out of contact with reality when he came into the hospital that he was unable to respond to what he was there for. He was evidently unable to be clothed because he was in a semi-rigid catatonic stooper. He was not eating and so on."
The more formal mental status exams were "very clear cut with respect to the symptoms of schizophrenia". Virtually all of the psychological tests confirmed the diagnosis of schizophrenia and these tests were given after his behavior had already improved considerably.
Cross examination by the state revealed that Dr. Miller's specialty was diagnostics; that some of the answers the appellant gave on the "Proverbs" test could be those of a sane person; that Dr. Miller interviewed the appellant for twenty to thirty minutes before he testified and at no other time; and that his conclusions were based primarily on the record and the history — the conclusion from the interview only being "confirmatory".
Dr. Miller stated that schizophrenics can know right from wrong and that at one point in a deteriorating thought disorder one of the things that people fairly often do is become "obsessional" about religion.
Dr. Miller frequently testifies for the District Attorney's office and as a court's witness.
The defense rested and the presentation of evidence by both sides was concluded.
The general principles of law regarding the burden of proof and the defense of insanity were most recently set forth and considered in Christian v. State, Ala., 351 So.2d 623 (1977). Those principles may be summarized as follows:
 1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
 2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
 3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and *Page 689 
to the reasonable satisfaction of the jury.
 4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 5. In making its determination, the jury may reject all expert testimony though it is without conflict.
 6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored.
Authority for each of these principles may be found inChristian, supra, at 351 So.2d 624.
The one exception to these rules is found in those cases where the proof of insanity is overwhelming and uncontradicted.
 "Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form." Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934).
A review of the case law in this state reveals that on only two occasions has this exception been invoked by an appellate court and a judgment of conviction reversed because the jury verdict was contrary to the preponderance of the evidence on the issue of insanity. Those cases are Christian, supra; and Pickett v.State, 37 Ala. App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699, 71 So.2d 107 (1954). Boyle, supra, although speaking to this issue, was reversed on other grounds. After careful consideration and long deliberation, we are of the opinion that the overwhelming evidence presented by the appellant has amply overcome the presumption of sanity.
In Boyle, supra, at 229 Ala. at 222, 154 So. 583 and Pickett, supra, at 37 Ala. App. 414, 71 So.2d 106, it was noted that
 ". . . courts should be careful not to invade the province of the jury in cases of this character. Although the evidence may be offered only by the defense, and all tend to one conclusion, yet, in view of the presumption of sanity, if the evidence is inconclusive, and reasonable inferences may be drawn that the act was that of a sane man as defined by law, the affirmative charge should be refused."
From a consideration of the testimony in this case, we are convinced that not only does the evidence of insanity all tend to one conclusion but that such evidence is conclusive. From all the evidence we see no facts which would support a reasonable inference that the homicide was that of a sane man as defined by law.
We make the following observations which were considered inHoward v. State, 172 Ala. 402, 409, 55 So. 255 (1911). The antecedent conduct and declarations of the defendant were thoroughly indicative of actual insanity and responsible men could not differ as to this conclusion. While the appellant was able to carry on a coherent conversation with Officer Melton his statements concerning the homicide are not the statements of a sane and rational man. Three of the witnesses, the three fellow employees, testified from more or less intimate acquaintance and prolonged personal observation of the defendant, that he was undoubtedly insane and irresponsible up to and including the day before the murder was committed. Two experts testified, one from some three and one-half months' period of personal observation of some degree or another, and another based upon a review of the appellant's medical history and hospital records together with a brief personal interview with the appellant, that he was legally insane at the time of and after the commission of the crime. Finally, there was apparently nothing before the jury to rebut the great mass of testimony directly showing actual insanity before, at the time of, and after the act in question. In other words, there were simply no facts before the jury from which opposing inferences might have been rationally drawn. Here, the evidence of insanity is not merely strongly persuasive; it is conclusive.
There was no evidence that the appellant was sane aside from the mere presumption of sanity. The appellant did not take the witness stand and therefore the jury was not afforded the "fruitful opportunity" to *Page 690 
form an estimate of his mental condition and to view, in some measure at least, the operations and perceptions of his mind.Howard, supra.
We further note that the evidence concerning the defendant's insanity was especially trustworthy. The three employees were not, strictly speaking, social acquaintances of the appellant. Apparently they knew little of his family and personal life away from the job and would have no special bias or prejudice for or against the appellant. No members of the appellant's family testified. Certainly there is no reason to suspect that the two psychologists who testified had any bias or interest in the appellant's cause. Dr. Miller often testified for the District Attorney's office and as a court's witness.
True, the jury may reject all expert testimony though it is without conflict and may do so if the testimony is weak, subject to bias or interest, unclear, or if there is another basis upon which to believe a defendant sane. Christian v.State, Ala.Cr.App., 351 So.2d 616, 623 (dissent) (1976). Yet here the expert testimony was subject to none of these criticisms and there was no basis for the jury to reject the overwhelming and uncontradicted proof of the appellant's insanity.
This appellant's conviction can only be sustained on the bare presumption of sanity prevailing as to every accused and afforded by statute. That presumption, being a presumption, is rebuttable by clear and sufficient evidence reasonably satisfying the jury of the existence of the claimed mental incapacity. However, we consider the undisputed and substantial evidence as to the appellant's mental defectiveness to have overcome this presumption.
The verdict and judgment being contrary to the evidence and the legal principles applicable, this cause must be reversed for the failure of the trial judge to give the affirmative charge.
REVERSED AND REMANDED.
All Judges concur.