Murder; sentence: fifteen years' imprisonment.
The fact that appellant shot and killed the victim is not an issue on appeal; hence it is unnecessary to detail the evidence here. Rather, the issue on appeal is whether the evidence at trial conclusively proved that the appellant, as a result of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Section 13A-3-1, Code of Ala. 1975. Therefore, we detail that evidence which tends to illustrate appellant's mental state at the time the murder was committed.
Mrs. George W. Smith, Jr., appellant's mother and the victim's wife, testified that something awakened her during the night of May 9, 1980, around 11:50 p.m. She got out of bed and saw appellant standing in the hall outside her bedroom holding a gun. She asked appellant what he was doing. She was then struck in the stomach, apparently with a shot from the gun appellant held in his hand. She immediately closed the bedroom door and locked it. She telephoned the police, the paramedics and relatives. When she turned on the light, she discovered that her husband, with whom she had been sleeping, was dead, having been shot in the head. Mrs. Smith stated that because of the shock she remembered little else that occurred that night. She did remember opening the bedroom window and telling her brother-in-law, whom she had telephoned, not to enter the house because appellant was in the hall, possibly still armed.
Mrs. Smith stated that appellant is her only son and that he was forty-one years old. Only Mrs. Smith, her husband, and the appellant were staying in the house that night. Appellant had come to stay at their home on Tuesday, May 6, 1980, because he was ill and had been there continuously since that date. There had been no argument or disagreement between appellant and his parents during his stay. In Mrs. Smith's words the three of them "were getting along real well." Appellant had helped his father get his boat that day, and they had all gone to the cemetery to decorate the graves of appellant's grandparents. Later, before Mrs. Smith retired to bed, she had taken ice to appellant's bedroom because he had a fever and had told him to awaken her if he needed her. She testified that appellant resided with her at the time of the trial.
John Grainger, a patrolman with the Hueytown Police Department, said he answered a call at 3216 Crescent Drive in Hueytown on May 9, 1980. Upon arrival he observed Mrs. Smith standing at a window in the house shouting that she and her husband had been shot. He went to the window and saw the wounded couple in the bedroom. Mrs. Smith told him that her son was in the house and was armed. As Officer Grainger attempted to remove the window screen, the porch light came on and a bathrobe was waived out through the door. Appellant then said, "I'm coming out and I'm unarmed." Appellant slowly exited the house in his pajamas with his hands up. Officer Grainger instructed appellant to lie down and then handcuffed him and placed him in the patrol car. Appellant was cooperative and told Grainger he was glad he had arrived. Patrolman Grainger was not questioned as to, nor did he have occasion at trial to relate, his impression of appellant's sanity or behavior.
Michael Laughlin, a social acquaintance of appellant's, testified that he had known appellant for twenty-five years, having attended high school and college together. Because they were both engineers, they had *Page 841 
continuing and frequent social and business connections. He stated that appellant's reputation for peace within the community was good.
Ann Benson, a friend of appellant's family for thirty-five years, testified to appellant's good reputation for peace and quietude. She further testified that she observed appellant on Friday, May 8, 1980, around 3:00 p.m. at his parent's home. Appellant was unable to concentrate on their conversation and tried unsuccessfully for thirty minutes to put food in his mouth. Appellant's father, mother, and cousin, Wayne Greer, were also present.
Haddie Mae Pinson, appellant's aunt and the victim's sister, stated that she talked by telephone to appellant on May 8, 1980. He told her there was a conspiracy going on and, in general, talked "crazy." She saw appellant, his father and mother the following day and accompanied them to a cemetery. She said appellant did not look himself and did not make sense in his conversation.
Walter Wayne Greer, appellant's cousin and a frequent hunting companion, went to visit appellant at his parent's home on May 9, 1980, around 1:00 p.m. because appellant was sick. Greer testified that appellant was unable to relate to the conversation and spoke of "illusions" he was having. Appellant told Greer that when he turned on the faucet the water came out blue and that he could see television and other visions with his eyes closed. Appellant also stated he was watching a truck being loaded through a sliding glass door. When Greer looked through the same glass door, all that was visible was a six-foot redwood wall. Appellant also told his father and Greer that the motor on his father's boat was "tore up." When Mr. Smith and Greer went and looked at the motor, they found that nothing was wrong with it. Greer stated he knew that appellant drank, but he had never seen appellant drunk or out of control because of drinking. Greer did not smell any alcohol on appellant's breath on the afternoon of May 9, nor did he see any sign of alcoholic beverages in the area. Because appellant was not acting normally that afternoon, it was Greer's opinion that appellant appeared to be insane.
Dorothy Smith, appellant's mother, was recalled and testified to the constant sobriety of her son during his stay in her home during the period in question. She stated that no alcoholic beverages were kept in her home. She also stated that appellant ate and slept very little during this period other than to doze infrequently and that he did not act like himself. His temperature, which she took daily, remained around 102° the entire time, and he was coughing and sneezing. Appellant became so ill that she and her husband took appellant to the emergency room at Lloyd Noland Hospital early the morning of May 8, 1980. The antibiotic and cough medicine prescribed at the emergency room were the only medicines or drugs she observed him take.
Although appellant and his father got along well, Mrs. Smith testified that her husband at one time had, at her urging, signed a warrant against appellant for trespassing. Appellant had been drinking and had entered his parent's home in their absence without a key to obtain some clothes. This family incident had been resolved however and was not a source of strife. Appellant and her husband hunted, fished, and golfed together frequently.
Dr. Allen Edgar Scheele, a clinical psychologist employed with the University of Alabama School of Medicine, was called by appellant to testify. Dr. Scheele stated that his work was in large part diagnostic and included preparing evaluations of the psychological suitability of applicants for the Birmingham Police Department and the Jefferson County Sheriff's Department. He stated that he interviewed appellant twice and appellant's mother once. He also administered a Minnesota Multiphasic Personality Inventory Test to appellant. As a result of the interviews and testing, Dr. Scheele was able to draw a conclusion as to appellant's mental condition at that time, although he did not make a formal diagnosis. He found that no major medical disorder existed at the time of the testing. *Page 842 
However, based upon appellant's medical history surrounding the time when he shot his father, Dr. Scheele testified that he believed that at the time the shooting occurred appellant was suffering from a psychosis caused by "brain damage — physical brain disease" resulting from alcohol withdrawal and fever from the pneumonia. He did not believe appellant could have appreciated the wrongful nature of his action or even known what he was doing. Dr. Scheele's opinion was that at the time of the shooting appellant lacked the capacity to be able to appreciate and perform the requirements of the law. He testified that appellant's peaceful surrender was not out of character with his diagnosis, and such compliance was consistent with behavior to be expected from one in that condition. Dr. Scheele stated that organic brain syndrome is reversible and clears up, along with the psychosis, within a few days.
Dr. William M. Harris, Jr., testified that he treated appellant at the Lloyd Noland Hospital emergency room on May 8, 1980. In his opinion appellant had pneumonia of the left lobe. Appellant had a temperature of 101.5° and his pulse was rapid. X-rays taken of appellant also indicated pneumonia. Dr. Harris prescribed penicillin, decongestant, codeine, erythromycin, and Tylenol for appellant.
Dr. Samuel David Morrison, called by appellant, testified that he was a physician specializing in psychiatry. After examining appellant he concluded there was no evidence of any psychiatric disorder at the time of the interview. However, projecting back to the time of the shooting, Dr. Morrison stated that appellant was suffering from acute psychosis diagnosed as organic brain syndrome or delirium characterized by a total misperception of reality. Such a psychosis is not an uncommon state and may be associated with a change in physiology, such as an increased temperature. Appellant's medical history also indicated that he was prone to this sort of reaction, having suffered withdrawal seizures after a bout of drinking in a previous year. In Dr. Morrison's opinion, appellant was insane at the time of the shooting, not having possessed the substantial capacity to appreciate the wrongfulness of his conduct or to rationally conform his conduct to the requirements of the law. Dr. Morrison also stated that, given the facts of this particular case, he would not expect any disagreement among other psychiatrists as to the diagnosis of severe organic brain syndrome. The fact that appellant complied with the officer at the time he surrendered would be consistent with breaking through the delirium and typical of what one in a delirium would respond to.
Appellant took the stand to testify in his own behalf. He stated that he had been to college and had a degree in electrical engineering. He testified that he contacted his parents by telephone the week he became sick and then came to their home on Tuesday morning. His parents decided not to take him to the hospital at that time because he did not have medical insurance. On Wednesday evening his temperature was 103°, and they began to bathe him in ice packs. The next morning his parents took him to the hospital emergency room where the doctor diagnosed him as having pneumonia and gave him two shots of penicillin. He was also given prescriptions which his father filled on the way home. He recalled the hallucinations began Thursday and that he was unable to relate to those around him. Appellant stated he had quit drinking the Sunday before he went to his parents' home because he had vomited blood and that he had not had anything to drink since that time. He did however drink before that time, consuming "a fifth or two" every week.
Appellant recalled the warrant signed by his father in 1979. He said he had been living with his parents and had a key to the house. However, a louvered door to the front porch was latched, and he had to break the louvers to gain access to the house because he was going out of town and wanted to get some clothes. He talked to his father about the incident, and his father dropped the charge and paid the costs. Appellant testified that he did not remember shooting his father or mother on *Page 843 
May 9, 1980, and did not remember anything that occurred until about a week after that time.
The defense rested at the close of appellant's testimony and moved unsuccessfully for a directed verdict and a judgment of acquittal. Appellant's motion for new trial and/or acquittal was denied and this appeal followed.
Appellant contends that the trial court erred in denying his motion for new trial and/or judgment of acquittal based upon the jury's arbitrary rejection of the great weight of evidence proving appellant's insanity at the time of the shooting.
The criteria used for determining whether appellant has met the burden of proof in sustaining the defense of insanity is set forth in Herbert v. State, 357 So.2d 683 (Ala.Cr.App.),cert. denied, 357 So.2d 690 (Ala. 1978), as follows:
 "1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
 "2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
 "3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury.
 "4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 "5. In making its determination, the jury may reject all expert testimony though it is without conflict.
 "6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored."
As Herbert points out, there is one exception to these general rules which may mandate a reversal of the jury decision to convict. Where the evidence of insanity is both overwhelming and uncontradicted, the jury should be instructed that the appellant has overcome the presumption of sanity.
In the instant case the evidence would have authorized the jury to find that appellant was insane at the time the shooting was committed. Indeed, the evidence of appellant's insanity from both expert and lay witnesses was undisputed and uncontradicted by the evidence presented by the State. Yet, the jury may reject all expert testimony, even though it is without conflict. Sasser v. State, 387 So.2d 237 (Ala.Cr.App.), cert.denied, 387 So.2d 244 (Ala. 1980).
 "Although the evidence may be offered only by the defense, and all tend to one conclusion, yet, in view of the presumption of sanity, if the evidence is inconclusive, and reasonable inferences may be drawn that the act was that of a sane man as defined by law, the affirmative charge should be refused." Boyle v. State, 229 Ala. 212, 222, 154 So. 575 (1934).
Therefore the question becomes whether the evidence presented was so conclusive, strong and overwhelming that it mandated that the jury find that appellant was insane at the time the crime was committed. We find that it was.
For all that appears from the record, we can find no facts which would give rise to a reasonable inference to sustain the jury's conclusion that appellant's act was that of a sane man; hence the conviction could only prevail because of the rebuttable statutory presumption of sanity. Because we consider that appellant has conclusively overcome this presumption of sanity by the great preponderance of the evidence, the jury's decision cannot stand. Herbert, supra.
The conduct of appellant during the two days immediately preceding the shooting was undisputedly shown to be that of a physically sick man in a mental state of delirium caused by a medically diagnosed illness. While Officer Grainger testified that appellant was cooperative, he gave no testimony as to his opinion of appellant's mental state. Expert testimony indicated appellant's cooperation was consistent with delirium. Though the lay witnesses were friends and relatives of the appellant, we *Page 844 
are also impressed that they were equally so related to the victim. Two experts testified, one a clinical psychologist and one a medical doctor specializing in psychiatry. The psychiatrist stated that under the particular medical facts and case history, there would be no disagreement among similar experts as to the medically diagnosed physical cause for appellant's mental disorder. Both experts testified appellant's conduct and physical condition indicated he was in a state of delirium caused by a very real physical impairment to his brain. And, finally, there were no facts before the jury to indicate a basis for any other reasonable inference for appellant's act. There was no evidence of intoxication, anger, or any motivation for appellant's senseless and tragic act.
The great preponderance of the evidence sustained the plea of insanity and was sufficient to rebut the State's presumption of sanity. We therefore hold that the trial court erred in overruling appellant's motion for new trial. Woods v. State,364 So.2d 1178 (Ala.Cr.App.), cert. denied, 364 So.2d 1186
(Ala. 1978).
REVERSED AND REMANDED.
All the Judges concur except DeCARLO, J., who dissents.