45 So.3d 779 (2010)
Harry Clifton RUSSELL
v.
STATE of Alabama.
CR-07-1956.
Court of Criminal Appeals of Alabama.
March 5, 2010.
*780 Jeffrey P. Montgomery, Gadsden, for appellant.
Troy King, atty. gen., and Marc Alan Starrett, asst. atty. gen., for appellee.
PER CURIAM.
The appellant, Harry Clifton Russell, was convicted of murdering Derrick "Shorty" Anderson, see § 13A-6-2, Ala.Code 1975. The circuit court sentenced him to 50 years in prison and directed that he be placed in a long-term mental health treatment program.
The shooting that resulted in Anderson's death occurred in February 2002. Initially, Russell was found incompetent to assist *781 his attorney in his defense and was committed to Taylor Hardin Secure Medical Facility. After several subsequent evaluations and hearings the circuit court, in November 2007, found that Russell was competent to stand trial. In May 2008, Russell pleaded not guilty by reason of mental disease or defect.
The State's evidence tended to show the following. On February 16, 2002, police were called to an American Legion Post in Etowah County after Anderson was shot in the parking lot. The shooting was witnessed by Michael McAlpine, an auxiliary member of the American Legion. McAlpine testified that on the evening of February 16, 2002, he drove into the parking lot of the American Legion and saw Russell, whom he had known for 25 years, and Anderson talking. He said that they talked for several minutes when Russell pulled out a gun, pointed the gun at Anderson's chest, and pulled the trigger. Russell then walked away, McAlpine said, maybe six steps and returned and fired two more shots at Anderson. Russell then put the gun in his pocket and walked away. McAlpine further testified that Russell was a regular patron at the American Legion, that Russell kept to himself, and that Russell did not socialize with others.
Another member of the American Legion, Harvey Haley, Jr., testified that he was in the building on the evening of the shooting and that he had seen Russell earlier that evening. Haley testified that he saw Anderson and another man order a sandwich and that about 30 minutes later he heard a "pop, pop, pop." The sound, he said, was coming from the entrance of the American Legion Post, but he could not see because of the way the cars were parked. After the third shot, he said, he saw Russell walking away from the parking lot. Haley testified that Russell never caused problems before, that Russell did not mix well with others, and that Russell was the historian for the American Legion Post.
Mark Harris, a detective with the Gadsden Police Department, testified that he was called to the American Legion Post to investigate the events that occurred on February 16, 2002. Det. Harris testified that after he was informed of the identity of the shooter he went to Russell's last known address. The house, he said, was in very poor condition; the front door was boarded up, and Russell was entering and exiting the house through one of the windows. Det. Harris and another officer returned to Russell's residence the next morning and they waited for Russell to exit the house. Russell emerged from the house and started walking. Det. Harris stopped him about one block from his house. A search revealed that Russell was carrying a .38 revolver. Both the State and the defense stipulated that the revolver was the murder weapon.
Det. Harris took Russell into custody and read him his Miranda[1] rights. He testified that Russell was calm and respectful and that he signed a waiver-of-rights form. Russell made the following statement, which was read into evidence by Det. Harris:
"On [February 16] of [2002] I was at [t]he American Legion on Eighth Street when an FBI bulletin came across the TV screen that a guy there was going to kill me. I know the man from seeing him in the Legion the past couple of months, but I do not know his name.
"Shortly after the news bulletin, the man got up and had some food in his hands and pointed his finger at me in a threatening gesture. He then walked *782 outside and I went outside behind him because I was going to go to the movies.
"When I got outside, the man looked at me in a threatening manner and I felt that I had to defend myself, so I pulled my pistol and shot him. The man fell to the ground and I shot him a couple or [sic] more times until I felt that he was no longer a threat.
"I then left and went to the movies and watched `Black Hawk Down.' When the movie was over, I walked around for awhile and then went home.... The next morning, I woke up with the police at my house. I didn't answer them at the door or when they called for me, but when I thought they left, I unloaded my pistol and left to go to the creek to throw the gun away but was arrested when I got away from my house."
(R. 223-25.)
Betty Terrell, Russell's half-sister, testified in his defense. She said that Russell excelled in school and that he joined the United States Army after graduating. While in the Army Russell was a missile repairman and won numerous awards. After leaving the Army he moved in with Terrell's mother and began working at the Anniston Army Depot. He was fired from the Depot, she said, because of poor hygiene. After leaving the Depot he returned to school to study to become a nurse. He later worked in Guntersville as a nurse, but he did not keep the job for long.
Terrell further testified that after leaving the Army Russell was fidgety, that he often looked over his shoulder, that he talked frequently about the FBI, that he did not associate with people, that he had been under psychiatric care, that his psychiatrist died, and that when his psychiatrist died Russell stopped going to the doctor. She said that at the time of his arrest Russell was living in an abandoned house that had no running water or electricity. The house had belonged to their sister, who had passed away. The sister's children had had Russell arrested for trespassing.
Russell also presented the testimony of two mental-health expertsDr. Patricia Pilkinton and Dr. James Hooper. Dr. Pilkinton, a psychiatrist at Taylor Hardin, testified that she evaluated Russell before trial and that he was her patient from July 2006 to November 2007. Dr. Pilkinton testified that Russell was initially examined by Dr. Denise Perone, a psychiatrist at Taylor Hardin, and found to have a psychosishe was breaking from reality and seeing and hearing things that were not real. Dr. Perone determined that Russell was paranoid and was having delusions. She said that when Dr. Perone became ill, Russell was treated by Dr. Hooper and was eventually transferred to her care. It was Dr. Pilkinton's opinion that when Russell shot Anderson he was suffering from a severe mental defect that interfered with his ability to appreciate the nature and character of his actions. Dr. Pilkinton further testified that it was her opinion that Russell had a serious mental illness, that he was schizophrenic, and that he had probably suffered from the illness for some time without being diagnosed or treated. She further testified that schizophrenia is a life-long disorder that manifests itself by antisocial behavior followed by acute symptoms that are characterized by delusions and erratic behavior and/or aggression. Dr. Pilkinton testified that Russell was acutely psychotic and very anxious. She prescribed a different antipsychotic for Russell, she said, and he began taking care of his personal hygiene. Dr. Pilkinton further testified that if Russell stopped taking his medication his symptoms would reappear.
*783 On cross-examination, Dr. Pilkinton testified that it was possible that some people had lucid intervals even during a period when their mental capacity was declining. She stated that Russell had held a licensed-practical-nurse license until 1997. Dr. Pilkinton further stated that some of Russell's actions during and immediately after the shooting could be interpreted as goal-directed behavior, a term which she said provides indicia of "logical, thoughtful, forward thinking" or the intention to achieve a desired result. (R. 363.) According to Dr. Pilkinton, Russell felt threatened by the victim, and he knew that if he shot the victim the victim would not be able to injure him. Dr. Pilkinton testified that Russell took specific actions with intended results. She conceded that Russell did not respond to the police when they came to his house and that he removed the bullets from the gun and attempted to dispose of the gun after he thought the police had left. With regard to Russell's departure from the crime scene, Dr. Pilkinton stated that the manner in which Russell just walked away following the shooting was inconsistent with her diagnosis. Further, Dr. Pilkinton testified that she was not aware of any objective evidence or documented history that Russell suffered any symptoms of mental illness before the offense except for allowing his nursing license to lapse; Dr. Pilkinton conceded that people lose their professional licenses for different reasons and that the changes in Russell's lifestyle could be described in relation to or attributed to things other than just mental disease.
Dr. Hooper, the director of medical and psychiatric services at Taylor Hardin, testified that Russell was having paranoid delusions while he was treating him and that he had a mental illness for quite some time before the shooting. Dr. Hooper testified that Russell was consistent in his recitation of the details of the shooting and stated that Anderson had threatened him and was going to kill him and that Russell's actions were consistent with someone with a mental illness and that he believed that Russell was suffering from this mental illness at the time of the shooting.
On cross-examination, Dr. Hooper testified that shooting the victim, walking several feet away, and then walking back to the victim and shooting him two more times while he lay on the ground could be viewed as consistent with Russell's belief that he was defending himself, but also could be consistent with someone who intends to kill a person and wanted to make certain the person was dead. Dr. Hooper further testified that Russell was capable of forming intent and that he intended to kill the victim:
"[Prosecutor]: And let me ask you this: Was Mr. Russell capable, in your opinion, of forming an intent to kill at that point in time?
"[Dr. Hooper]: I think he was capable of forming an intent, yes, sir.
"[Prosecutor]: So based on his actions, he intended to kill Mr. Anderson?
"[Dr. Hooper]: I think he did intend to kill Mr. Anderson, yes, sir."
(R. 424.) The following then occurred:
"[Prosecutor]: Okay. Now, you think he understood the concept of self-defense and didn't believe that he was doing anything wrong?
"[Dr. Hooper]: Yes, sir.
"[Prosecutor]: Well, could you tell me then how hiding the gun would not be an indication of him understanding it was wrong to have shot someone
"[Dr. Hooper]: Well
"[Prosecutor]:or attempting to hide the gun? I mean, I can understand if you're acting in self-defense and you believe that and that's your thought, you *784 know, that the snakes are under the chair and I'm acting in self-defense and I shoot someone, I can understand how I would call the police, how I would get some help, how I would turn in the gun, how the threat's no longer there, because I haven't done anything wrong; I have nothing to fear and I certainly don't have any reason to throwto hide my gun
". . . .
"[Prosecutor]: But how is it that that would not be a wrongful act? Or at least an example of objective action so showing that he understood the wrongfulness of what he did?
". . . .
"[Dr. Hooper]: Okay. I think that that goes along with the fact that Mr. Russell, in his mind, was receiving input from the FBI. If he felt like he was being threatened then, I mean, I don't think that this is a single event where suddenly he gets this message that this guy is going to kill him. Because I think most of us, if we were sitting somewhere and the TV set suddenly said `somebody's going to kill you,' that we would not just immediately grab a gun and shoot whoever they said; we would wonder what was going on.
"I think that Mr. Russell's walking away and not responding to the police is all consistent with that. I don't know whether he was hiding the gun or getting rid of the gun and, I mean, I don't know that anybody knows that. I can I don't see that as an inconsistent act, but it also could be consistent with somebody who was trying to cover up the crime. I mean, you know, I can't give you a logical answer to that."
(R. 425-26.) (Emphasis added.) Dr. Hooper further testified that Russell's act of attempting to discard the gun was not consistent with the theory that Russell believed that his life was still in danger.
"[Dr. Hooper]: Yeah, that isolated event is not as consistent as the rest of it.
"[Prosecutor]: And that's just like leaving the scene. If you're not guilty of anything or don't recognize the wrongfulness of anything, that'sor running from theor trying to avoid the police?
"[Dr. Hooper]: Right. I think that those things are all highly consistent. I think that he felt paranoid, was not trustful of other people. He perceived a message that the FBI was going to kill him or that the FBI was telling him that this guy was going to kill him. He shot that guy, then he thought about it and shot him some more to make sure he was dead, then he left went back to his hovel he was living in, he didn't come out when the police called him and he did apparently gettry to go get rid of the gun. That doesn't fit into the story very well. But it
"[Prosecutor]: That is an objective act that shows or would tend to show, does it not, that he recognized he had done something wrong. Does it not?

"[Dr. Hooper]: ItI don't see it as such, but I understand that it could be seen as such.

"[Prosecutor]: Right. Well, if a person did understand that they had done something wrong by shooting someone, wouldn't the logical and correct procedure for them to befor them to do would be to get rid of the gun? That's what a logical murderer would do, right?
"[Dr. Hooper]: I guess.
". . . .
"[Dr. Hooper]: I mean, I guess. I mean, I'm not sure what the logic of committing a murder probably is.
"[Prosecutor]: I understand that.

*785 "[Dr. Hooper]: I mean, yeah, getting rid of the weapon is something that lots of people that commit crimes do.
"[Prosecutor]: And that is an indication, is it not, that he understood the wrongfulness of what he'd done?
"[Dr. Hooper]: Well, you're trying to get me to say that it shows that he knew it was wrong and I'm saying that I'm not really sure what was going on.
"[Prosecutor]: Let me put it this way: Isn't that just as much an indication that he knew that it was wrong as it is an indication that he was operating under delusion? Couldn't it go either way?

"[Dr. Hooper]: That particular act, yeah, it could go either way.

"[Prosecutor]: Okay. Now, y'all didn't get to see him to evaluate himto start observing him until overwell over three years from the time this crime occurred?
"[Dr. Hooper]: Yes.
"[Prosecutor]: And during that period of time, he was incarcerated, as far as you know?
"[Dr. Hooper]: Yes, sir.
"[Prosecutor]: As far as you know, he was receiving no treatment, no medication, no anything like that?
"[Dr. Hooper]: As far as I know, yes, sir.
"[Prosecutor]: Are there not some people in this world who just can't stand incarceration?
"[Dr. Hooper]: Yes, sir.
"[Prosecutor]: Are there not some people in this world who actually maybe are not mentally incompetent before they go to jail, but when they get to jail they become mentally incompetent because they don'tthey just can't stand being locked up?
"[Dr. Hooper]: Yes, sir.
"[Prosecutor]: How do you know he's not one of those people?
"[Dr. Hooper]: I don't have any hard evidence to say that. I mean, you know, that's a possibility. Based on thirty years of seeing patients and being at Taylor Hardin for twenty years, I don't think that's what's happened. But I can't prove it.
"[Prosecutor]: It's a subjective decision on y'all's part?
"[Dr. Hooper]: Yes, sir. It is an opinion that all of the psychiatrists share, but yeah.
"[Prosecutor]: And it certainly would have been a whole lot better or you wouldlet me put it this way: Would you have felt more comfortable with your opinion if you could have seen him, say, a week after it happened?
"[Dr. Hooper]: Oh, yeah, it's always better to see somebody as soon as possible."
(R. 430-34.) (Emphasis added.)
The State presented no mental-health expert of its own but relied on the evidence presented by and the cross-examination of the defense's two experts.

I.
Russell argues on appeal that the circuit court erred in not overturning the jury's verdict and/or granting his motion for a new trial because, he argues, the verdict was against the great weight of the evidence. Specifically, he argues that the weight of the evidence showed that he had a mental disease or defect that rendered him legally insane at the time of the shooting.
Russell moved for a new trial arguing that the verdict was contrary to law or the weight of the evidence. This issue was preserved for appellate review. See Zumbado *786 v. State, 615 So.2d 1223 (Ala.Crim. App.1993).
In discussing the distinction between the sufficiency of the evidence and the weight of the evidence, this Court in Johnson v. State, 555 So.2d 818 (Ala.Crim. App.1989), stated:
"The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, `viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.' Tibbs v. Florida, 457 U.S. 31, 37, 102 S.Ct. 2211, 2216, 72 L.Ed.2d 652 (1982). Accord, Prantl v. State, 462 So.2d 781, 784 (Ala.Cr.App.1984). The evidence in this case is clearly sufficient to support the convictions. See Donahoo v. State, 505 So.2d 1067, 1070 (Ala. Cr.App.1986); Ward v. State, 484 So.2d 536, 537-38 (Ala.Cr.App.1985).
"In contrast, `[t]he "weight of the evidence" refers to "a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other."' Tibbs v. Florida, 457 U.S. at 37-38, 102 S.Ct. at 2216 (emphasis added). We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. E.g., Franklin v. State, 405 So.2d 963, 964 (Ala.Cr.App.), cert. denied, 405 So.2d 966 (Ala.1981); Crumpton v. State, 402 So.2d 1081, 1085 (Ala.Cr.App.), cert. denied, 402 So.2d 1088 (Ala.1981); Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala.1981). `"[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine."' Harris v. State, 513 So.2d 79, 81 (Ala.Cr.App. 1987) (quoting Byrd v. State, 24 Ala.App. 451, 136 So. 431 (1931)). In this case, the conflicting evidence offered by the state and by Johnson simply presented a jury question, Gunn v. State, 387 So.2d 280, 282 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980), and the verdicts rendered thereon are conclusive on appeal, Roberson v. State, 162 Ala. 30, 32, 50 So. 345, 346 (1909); Bragg v. State, 518 So.2d 847, 849 (Ala.Cr.App.1987)."
555 So.2d at 819-20.
Section 13A-3-1, Ala.Code 1975, provides:
"(a) It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
"(b) `Severe mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
"(c) The defendant has the burden of proving the defense of insanity by clear and convincing evidence."
In Sistrunk v. State, 455 So.2d 287 (Ala.Crim.App.1984), we discussed the burden on a defendant who pleads not guilty by reason of mental disease or defect. We stated:
"Appellant pleaded not guilty by reason of insanity, thereby saddling himself with the heavy burden of proving his insanity by a preponderance of the evidence and to the jury's reasonable satisfaction. See Herbert v. State, 357 So.2d 683, 688 (Ala.Crim.App.), cert. denied, 357 So.2d 690 (Ala.1978). He sought to prove his lack of criminal responsibility through the testimony of several of his family members as well as expert witnesses. *787 Appellant now asserts that the verdict must be reversed as against the weight of the evidence.
"The basic principles of law governing the insanity defense are summarized in Herbert, supra. They are:
"`1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
"`2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
"`3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury.
"`4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
"`5. In making its determination, the jury may reject all expert testimony though it is without conflict.
"`6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored.'
"Herbert is one of only seven cases to date in which an Alabama appellate court has overturned a murder conviction on the ground that the guilty verdict ran against the overwhelming weight of the evidence of insanity. See Pickett v. State, 37 Ala.App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699, 71 So.2d 107 (1954); Christian v. State, 351 So.2d 623 (Ala.1977); Woods v. State, 364 So.2d 1178 (Ala.Crim.App.), cert. denied, 364 So.2d 1186 (Ala.1978); Sasser v. State, 387 So.2d 237 (Ala.Crim.App.), writ denied, 387 So.2d 244 (Ala.1980); Smith v. State, 411 So.2d 839 (Ala.Crim. App.1982); and Turner v. State, 455 So.2d 910 (Ala.1984). In order for this court to reverse, evidence of insanity must be `overwhelming,' Christian, supra at 625; `uncontradicted,' Herbert, supra, at 689; and `clear ... strong and undisputed,' Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934). Furthermore, there may be no facts in evidence which would support a reasonable inference that the defendant was sane. Compare Cunningham v. State, 426 So.2d 484, 491 (Ala.Crim.App.1982), cert. denied, 426 So.2d 484 (Ala.1983), with Alvis v. State, 434 So.2d 859, 864 (Ala. Crim.App.1983). In Cunningham, this court found that `[t]he defendant's conduct and demeanor after the crime provided a reasonable inference of sanity.' But in Alvis, an assault case, there was nothing in the defendant's conduct or demeanor to support the inference that his acts `were those of a sane man.' Alvis, id.

"Because of the presumption of sanity, the state is not required to prove that the defendant is sane. See Dancy v. State, 437 So.2d 620, 621 (Ala.Crim.App. 1983); Cunningham, supra, at 490. A guilty verdict is not arbitrary if the record reveals any facts from which the jury could have inferred that the defendant was sane at the time of the crime. Cunningham at 489. This is true even though all the expert witnesses testify that the defendant was insane, because of the rule that the jury may reject even uncontradicted expert testimony. Herbert, supra, at 688.
"As we noted in Cunningham, it is a rare case in which the jury's finding will be disturbed in favor of the appellant's evidence of insanity. Analysis of these cases requires a careful examination of the record in order to determine what, if any, evidence was available from which *788 the jury could reasonably conclude that the defendant knew what he was doing and/or could have controlled his criminal behavior. Presentation of a mere reasonable doubt of sanity does not authorize an acquittal. Boswell v. State, 63 Ala. 307, 326, 35 Am. Rep. 20 (1880)."
455 So.2d at 288-89.
"`Although "a factfinder need not adhere to an expert opinion on incompetency if there is reason to discount it," Strickland v. Francis, 738 F.2d 1542, 1552 (11th Cir.1984), "the jury cannot arbitrarily ignore the experts in favor of the observations of laymen," id., and must have an "objective reason," to disregard the expert's opinion which is rebutted only by lay testimony. Wallace v. Kemp, 757 F.2d 1102, 1109 (11th Cir.1985).
"`"In making this judgment [to disregard the expert's opinion], the court should consider
"`"(1) the correctness or adequacy of the factual assumptions on which the expert opinions are based;
"`"(2) possible bias in the experts' appraisal of the defendant's condition;
"`"(3) inconsistencies in the experts' testimony, or material variations between experts; and
"`"(4) the relevance and strength of the contrary lay testimony.
"`"Strickland, 738 F.2d at 1552; Brock [v. United States,] 387 F.2d [254, 258 (5th Cir.1967) ] (quoting Mims v. United States, 375 F.2d 135, 143-44 (5th Cir.1967))."
"`Wallace v. Kemp, 757 F.2d at 1109.'"
Dunaway v. State, 746 So.2d 1021, 1033 (Ala.Crim.App.1998), quoting Ellis v. State, 570 So.2d 744, 752-53 (Ala.Crim.App.1990).
In discussing the "objective reasons" that will support disregarding an expert's opinion, the United States Court of Appeals for the Fifth Circuit has stated:
"It has been recognized that expert opinion evidence may be rebutted by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, `the reasoning by which he progresses from his material to his conclusion,' the interest or bias of the expert, inconsistencies or contradictions in his testimony as to material matters, material variations between the experts themselves, and defendant's lack of co-operation with the expert. Also, in cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms, or where it is based on narrative statements to the expert as to past events not in evidence at the trial. In some cases, the cross examination of the expert may be such as to justify the trier of facts in not being convinced by him. One or more of these factors may, depending on the particular facts of each case, make a jury issue as to the credibility and weight to be given to the expert testimony; and in determining whether such issue is raised, due consideration must be given to the fact that the trier of facts has the opportunity to observe the witness if he testifies in person."
Mims v. United States, 375 F.2d 135, 143-44 (5th Cir.1967) (footnotes omitted; emphasis added).
Dr. Pilkinton testified on cross-examination that Russell did not come to Taylor Hardin until three years and eight months after the shooting and that it would have been helpful to have evaluated him closer to the time of the shooting. She said that she tried to get outside records to help with their diagnosis but *789 could not obtain any hospital records, any treatment records, or any veteran records related to Russell. Russell had no documented mental illness before the shooting. Dr. Pilkinton further testified that she based her opinion of Russell's mental condition on information he had supplied to her and observing his conduct. Dr. Pilkinton did testify that individuals can lie about their condition, but she believed that Russell was being truthful. Dr. Hooper testified to the following on cross-examination:
"[Prosecutor]: Are there not some people in this world who actually maybe are not mentally incompetent before they go to jail, but when they get to jail they become mentally incompetent because they don'tthey just can't stand being locked up?
"[Dr. Hooper]: Yes, sir.
"[Prosecutor]: How do you know he's not one of those people?
"[Dr. Hooper]: I don't have any hard evidence to say that. I mean, you know, that's a possibility. Based on thirty years of seeing patients and being at Taylor Hardin for twenty years, I don't think that's what's happened. But I can't prove it."
(R. 432-33.)
Although two experts did testify that Russell suffered from a mental disease or defect at the time of the shooting, the jury had "objective reasons" for disregarding their testimony. There was evidence from which the jury could have concluded that Russell appreciated the nature and quality or wrongfulness of his actions. As stated above, witnesses testified concerning Russell's actions during and after the murder and his attempt to hide the gun he had used to kill Anderson. Here, the question of Russell's sanity was for the jury to resolve. We will not reweigh the evidence by going behind the jury's ultimate decision that Russell was not suffering from a mental disease or defect at the time of the shooting. See Sistrunk, supra. The circuit court did not err in declining to overturn the jury's verdict and denying Russell's motion for a new trial.

II.
Russell next argues that he was denied the effective assistance of counsel because, he says, his trial counsel failed to make a motion for a directed verdict, failed to object to questioning by the prosecution as irrelevant, prejudicial, and argumentative, and failed to object during sentencing that Russell was incompetent.
However, Russell did not present these claims of ineffective assistance of counsel in his motion for a new trial.
"`"[A]n ineffective-assistance-of-counsel claim must be presented in a new trial motion filed before the 30-day jurisdictional time limit set by Rule 24.1(b), Ala. R.Crim. P., expires, in order for that claim to be properly preserved for review upon direct appeal."' [Montgomery v. State, 781 So.2d 1007,] at 1010 [(Ala.Crim.App.2000) ] (quoting Ex parte Ingram, 675 So.2d 863, 865 (Ala. 1996))."
Willingham v. State, 796 So.2d 440, 445 (Ala.Crim.App.2001). These issues were not preserved for appellate review; thus, they are not properly before this Court.
For the forgoing reasons, Russell's conviction for murder is due to be, and is hereby, affirmed.
AFFIRMED.
WISE, P.J., and WINDOM and MAIN, JJ., concur.
WELCH, J., dissents, with opinion, which KELLUM, J., joins.
*790 WELCH, Judge, dissenting.
In affirming Russell's conviction and in holding that the jury had objective reasons for disregarding the extensive expert testimony establishing that Russell suffered from a severe, life-long mental disorder that rendered him unable to appreciate the nature and quality or wrongfulness of his actions when he killed Anderson, the majority has interpreted long-standing legal principles in such a way that no defendant will be able meet the legal standard necessary to prove that he or she is not guilty by reason of mental disease or defect. The record in this case established two significant points: first, the evidence presented at Russell's trial proved by clear and convincing evidence that "at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts," see § 13A-3-1, Ala.Code 1975; second, the record established that the jury, with no objective reason, arbitrarily ignored the opinions of the expert witnesses, who provided overwhelming and undisputed evidence of Russell's mental disease or defect. This case is one of the extremely rare cases in which a conviction must be overturned because it is against the overwhelming weight of the evidence. Therefore, I dissent.
The majority has set forth the relevant legal principles, including § 13A-3-1, Ala. Code 1975the statute defining the parameters of the insanity defense, the presumption of sanity, and the standards by which an appellate court reviews a jury's decision to disregard expert opinion regarding a defendant's mental state. The majority has also set forth some of the relevant facts. However, I believe that the majority has failed to set forth all of the relevant facts, and I believe that the majority has incorrectly applied the law to the facts. In order to adequately assess the evidence presented and the jury's rejection of the expert testimony regarding Russell's longstanding mental disorder, a more thorough discussion of the evidence is necessary.
The majority's discussion of the experts's testimony failed to included many details about the severity and longstanding nature of Russell's mental disorder. Dr. Patricia Pilkinton testified for the defense that she was a psychiatrist at Taylor Hardin Secure Medical Facility, a maximum-security hospital. She stated that she was a full-time employee of the State of Alabama and was an independent evaluator not hired by either the prosecution or the defense. Dr. Pilkinton stated that she evaluated Russell several times before trial and that he was a patient under her care from July 2006 to November 2007. Dr. Pilkinton performed her evaluations pursuant to a court order.
Dr. Pilkinton testified that Russell's admission examination, which was performed by Dr. Denise Perone, a psychiatrist at Taylor Hardin, revealed that Russell had a "psychosis not otherwise specified," meaning that Russell had psychotic symptoms, that he was paranoid and not in contact with reality, and that he was having visual and auditory delusions. At the time, he also had bad body odor and a long beard, and he was not maintaining his personal hygiene.
Dr. Pilkinton stated that because Russell was being treated at Taylor Hardin, it would have been difficult for him to feign his psychotic symptoms because Taylor Hardin is a hospital with an observation staff on duty 24 hours a day, 7 days a week. Dr. Pilkinton stated that staff members at Taylor Hardin always evaluate new patients for malingering. Staff members observe the patients's day-to-day interactions, observing them on camera *791 when the patients are unaware that they are being watched.
Dr. Pilkinton testified that Dr. Perone became ill, that Dr. James Hooper began seeing Dr. Perone's patients, and that Dr. Hooper treated Russell for six months. Dr. Hooper maintained that Russell had a "psychosis not otherwise specified" as well, and treated Russell with antipsychotic medications for his hallucinations and delusions. Dr. Hooper filed several forensic-status reports with the trial court; those reports stated that Russell was suffering from a serious mental disease or defect.
Dr. Pilkinton testified that Russell was next transferred to her care. Dr. Pilkinton stated that, when Russell shot Anderson, he was suffering from a severe mental defect that interfered with his ability to appreciate the nature and character of his actions. Dr. Pilkinton testified that she believed Russell had schizophrenia and that he had probably suffered from that mental illness for years without being diagnosed and treated. She testified that schizophrenia is a brain disorder, that it has different phases, and that it takes time to diagnose. Dr. Pilkinton also explained that schizophrenia is a life-long disorder and that in the first phase of the disease when the patient is young, the patient often seems normal. The second phase involves antisocial behavior, dropping out of school, an inability to hold a job, and even an inability to take care of one's personal appearance. Dr. Pilkinton stated that the patient's family usually notices this behavior, but the patient does not. The next phase involves acute symptoms, and usually treatment at a psychiatric facility because patients have delusions or exhibit erratic behavior or aggression. Dr. Pilkinton stated that although the behaviors may get better for a short period, schizophrenic patients experience an overall decline. In the final phase of schizophrenia patients appear to have dementia and seem vacant, much like patients with Alzheimer's disease. Dr. Pilkinton believed that Russell demonstrated this common schizophrenic progression downhill from working in the military, to losing his nursing license, to losing a janitorial job at a Wal-Mart store.
Dr. Pilkinton testified that Russell was acutely psychotic and very anxious when she treated him. She testified that Russell had told the nurses at Taylor Hardin several times a day that he believed that he was being poisoned. Russell told the Taylor-Hardin staff that the jailers at the Etowah County jail had put pills in his food to poison him or to induce him to perform homosexual acts. Dr. Pilkinton stated that it was difficult to get Russell to the dining room to eat with other residents. Russell continued to claim, even while he was being treated at Taylor Hardin, that he was receiving messages through the television. Dr. Pilkinton stated that Russell often talked to himself when no one else was present. Russell told Dr. Pilkinton that his attorney was conspiring with other attorneys and with the judge to take an electronic device that he had invented and make money from it. Dr. Pilkinton testified that Russell described the shooting of Anderson the same way each time he related the events to her, even if he was exhibiting acute symptoms of schizophrenia at the time that he gave the description. The consistency in Russell's description was significant, Dr. Pilkinton testified, because it indicated to her that Russell was not malingering. Russell told her that he was at the American Legion Post in Gadsden and that he received messages through the television that someone was going to kill him. Russell told her that a man at the club whom he had seen before but did not know made a hand gesture toward him that Russell interpreted to mean that the person had been sent *792 to kill him. Dr. Pilkinton stated that this was characteristic of someone with schizophrenia because a schizophrenic person finds significance in things in his environment that no one else finds. Russell said that he killed the man because he believed that the man had been sent to kill him and that he feared for his life. I note that the explanation of the shooting Russell gave to Dr. Pilkinton was the same explanation Russell gave in his statement to the police one day after the shooting. Russell always maintained that he had received messages through the television before the shooting and that he acted out of fear for his life.
Dr. Pilkinton found it significant that Russell calmly walked away from the scene of the crime, and that he went to a movie after the shooting. In fact, Dr. Pilkinton noted that Russell wandered away from the sceneindicating he was not trying to elude the police or to hide, but that he simply left the area. Dr. Pilkinton stated Russell's plan to dispose of the gun the day after the shooting did not demonstrate that Russell appreciated the wrongfulness of his conduct; rather, Dr. Pilkinton testified, "I don't think that it does. I think that not answering the doorhiding things is entirely consistent with somebody who is paranoid and we certainly see that in people that we work with." (R. 373-74.) Dr. Pilkinton further testified that it would not be unusual for a schizophrenic to hide a weapon if the person believed others were conspiring against him.
Dr. Pilkinton stated that after Russell came under her care she prescribed a different antipsychotic medication and that Russell thereafter began to show improvement in his symptoms and to take care of his personal hygiene. After several months of treatment, Dr. Pilkinton believed that Russell was competent to stand trial. Dr. Pilkinton testified that if Russell stopped taking his medication, his symptoms would reappear within a few months or a year.
Russell told Dr. Pilkinton that he did not have any schizophrenic symptoms before the date of the shooting, but that he had felt depressed and had sought help at the Veterans Administration ("VA") hospital. Dr. Pilkinton stated that it is not unusual for schizophrenics to fail to realize that they are exhibiting psychiatric symptoms. Dr. Pilkinton attempted to acquire Russell's VA records, but the VA denied having any records for Russell. Dr. Pilkinton testified that she had not located any psychiatric or military records for Russell, but that this did not change her opinion that Russell had a severe mental illness. Dr. Pilkinton stated that the records would have only supplemented her specific diagnosis of the type of schizophrenia from which Russell suffered. She explained the certainty of her diagnosis:
"My heart of hearts is that Mr. Russell has schizophrenia. And I've worked with people with schizophrenia extensively. That's an area of interest of mine and that's what I teach at the University. And I believe that that's what he has. And I believe that that influenced his behavior, has dominated his life for many years. And unfortunately we didn't pick that up. He probably went undiagnosed for a very long time and that it was his delusions and his paranoia that lead him to"
(R. 387.)
Dr. Pilkinton further testified:
"In working with people with schizophrenia, treating people with schizophrenia extensively in state hospitals and private practice, this is a picture of schizophrenia. And I believe that his actions were motivated by paranoia, by this feeling of persecution, the feeling *793 that he was going to be imminently harmed or killed, and this is entirely consistent with what I see from other patients that I work with with major mental illness like schizophrenia. So this is what I do as my day-to-day work, what I spend most of my time doing."
(R. 387-88.)
Finally, Dr. Pilkinton stated that a person who has a first-degree relative with schizophrenia has an increased risk of developing schizophrenia. Evidence at trial indicated that Russell's sister had unidentified mental-health issues.
Dr. James Hooper testified for the defense that he was the director of medical and psychiatric services at Taylor Hardin. Dr. Hooper testified that he, like Dr. Pilkinton, was an employee of the State of Alabama and was not an expert retained by Russell. He also stated that his job was to give the court an impartial opinion of Russell's mental state. Dr. Hooper stated that he diagnosed Russell as having a "psychosis not otherwise specified." (R. 408.) Dr. Hooper stated that Russell had paranoid delusions while he was under Dr. Hooper's care and that Russell repeatedly stated that he believed that the FBI was communicating to him through the television. Dr. Hooper treated Russell for six months, and Russell showed no signs of improvement during that time. Dr. Hooper stated that it was very unusual for the staff members at Taylor Hardin to see someone who really was delusional and that when this occurred the staff members attempted to keep the patient in the hospital. Dr. Hooper stated that Russell truly had been delusional while he was at Taylor Hardin. Dr. Hooper testified that he was initially not sure whether Russell's mental health was ever going to improve. However, when Dr. Pilkinton changed Russell's medication Russell responded well enough to be considered competent to stand trial, Dr. Hooper said.
Dr. Hooper testified that Russell's recitation of the details regarding Anderson's shooting was consistent. Russell stated that Anderson had threatened him and was going to kill him, and Russell stated that he had received messages through the television from the FBI. Dr. Hooper stated that the behavior he observed in Russell was indicative of someone with a mental illness. Dr. Hooper stated that Russell's hiding from the police and attempting to dispose of the weapon were consistent with Russell's delusion that there was an FBI conspiracy against him. Dr. Hooper testified that he believed that Russell was suffering from a mental disease or defect at the time of the shooting and that the mental illness prevented him from appreciating the nature and character of his actions.
Dr. Hooper also stated that people with mental illnesses often have bad hygiene. With medication, Russell's personal hygiene improved, and Russell began to realize that he might have a mental illness.
Dr. Hooper stated on cross-examination that hiding a gun and avoiding the police were actions consistent with someone who knew he had committed a wrongful act. However, Dr. Hooper also stated that he did not believe that those behaviors were inconsistent with Russell's mental illness because Russell suffers from paranoia. Dr. Hooper stated on redirect examination that Russell has a global paranoia and that he is afraid of everyone; the global paranoia caused Russell to isolate from others and to sometimes talk to himself while sitting alone. Dr. Hooper stated that these behaviors manifested in Russell long before Russell shot Anderson and that Russell had suffered from a mental illness for quite some time before the shooting.
It is also significant that Russell initially was declared incompetent to stand trial *794 and that it was only after extensive treatment with antipsychotic medicines that he was declared competent to stand trial. The record reflects that in August 2003, approximately six months after he was arrested, the trial court ordered an examination of Russell's competency to stand trial and an examination of Russell's mental state at the time of the offense. The case was continued in May 2004 for a forensic evaluation and was continued twice in 2005 pending results of the forensic evaluation. Following a competency hearing in 2005, the trial court ordered that Russell be committed to the care of the Department of Mental Health because he was unable to assist his attorney in his own defense. Forensic evaluation reports about Russell's mental state were filed with the court by psychiatrists with the Department of Mental Health during 2006 and 2007. In November 2007, the trial court ordered that Russell be released from the custody of the Department of Mental Health because Russell had been declared competent to stand trial.
Testimony about Russell's longstanding mental illness, his mental deterioration prior to the shooting, and his apparent inability to interact with others or to maintain employment or his own residence was consistent. The defense presented extensive and uncontradicted testimony from two unbiased experts about Russell's longstanding psychosis and their opinion that Russell was suffering from a mental disease or defect at the time of the shooting. In spite of the uncontradicted and unrebutted testimony presented at trial, the majority holds that the jury could have reasonably concluded that Russell was sane when he shot Anderson. The majority offers only the barest rationale for its decision, stating:
"[T]he jury had `objective reasons' for disregarding [the experts'] testimony. There was evidence from which the jury could have concluded that Russell appreciated the nature and quality or wrongfulness of his actions. As stated above, witnesses testified concerning Russell's actions during and after the murder and his attempt to hide the gun he had used to kill Anderson."
45 So.3d at 789 (emphasis added). I disagree.
The majority correctly states that the law creates a presumption of sanity for every person over the age of 14 years and that Alabama's appellate courts have held that a jury deciding the weight of the evidence regarding proof of insanity may reject even uncontradicted expert testimony. However, a jury's right to reject expert testimony about a defendant's mental condition is not unbridled; rather, the jury's rejection of expert testimony is evaluated to determine whether the jury arbitrarily rejected expert testimony or whether the jury had an objective reason to disregard the testimony. The majority quotes Dunaway v. State, 746 So.2d 1021 (Ala.Crim.App.1998), in which this Court examined cases establishing factors an appellate court should consider when reviewing a factfinder's decision to disregard an expert's opinion about a defendant's mental condition in favor of the observations of laypersons. As the majority noted, in assessing the factfinder's decision to disregard the experts' opinion, a court on review should consider:
"(1) the correctness or adequacy of the factual assumptions on which the expert opinion is based;
"(2) possible bias in the experts' appraisal of the defendant's condition;
"(3) inconsistencies in the expert's testimony, or material variations between experts; and
"(4) the relevance and strength of the contrary lay testimony."
*795 Wallace v. Kemp, 757 F.2d 1102, 1109 (11th Cir.1985).
An evaluation of the evidence in light of the foregoing factors demonstrates no objective reason for the jury to have disregarded the experts's testimony about Russell's insanity.

1. The correctness or adequacy of the experts's factual assumptions

Dr. Pilkinton and Dr. Hooper based their opinions on repeated examinations and evaluations of Russell over a span of many months while Russell was confined in Taylor Hardin Secure Medical Facility, where he was under constant observation by the medical staff. Dr. Pilkinton testified that during the year and a half that Russell had been assigned to her unit at Taylor Hardin, she had had daily contact with and the opportunity to observe Russell. The psychiatrists had the benefit of the consistent reports from staff members regarding Russell's anxious and paranoid behavior, his lack poor personal hygiene, and his unwillingness to participate in group activities with other patients. Russell's abnormal behavior and delusions continued for many months after he was placed at the facility, in spite of treatment that included anti-psychotic medications.
The majority notes that Russell was admitted to Taylor Hardin more than three years after the shooting and that Dr. Pilkinton had acknowledged that it would have been beneficial to have evaluated Russell immediately after the shooting. Dr. Pilkinton also testified, however, that she did not believe she would have reached a different conclusion about Russell's mental condition even if she had seen Russell sooner after the crime. Both psychiatrists were convinced that Russell suffered from a long-standing and severe mental illness at the time of the shooting.
The majority notes that there was no documentation indicating that Russell suffered from or was treated for mental illness before the shooting. However, the fact that the experts were unable to obtain records for any previous psychiatric treatment did not alter their opinion regarding Russell's mental state and cannot support the jury's rejection of their expert opinion. Dr. Pilkinton testified that Taylor Hardin had requested treatment records from the VA, a local mental-health center, and one of Russell's previous employers but had received no records; one facility had indicated that Russell had not been treated there, and another facility refused to release the records. Dr. Pilkinton noted, however, that when Russell was transferred from the Etowah County jail to Taylor Hardin, the transfer summary indicated that Russell had told jail staff members that he believed he was being poisoned by the staff. Furthermore, there was no testimony that Russell was malingering or that he was exaggerating his symptoms; all the evidence was to the contrarythat Russell's behavior was indicative only of a long-term psychotic disorder.
Moreover, the experts testified that Russell's explanation of his thoughts and actions at the time of the shooting remained consistent. Russell believed that Anderson was a threat to him because, Russell said, he had received a message from the FBI through the television at the American Legion Post indicating that someone was going to kill him. Russell's statement to the police immediately after the shooting was identical to the explanation of events Russell consistently gave to the psychiatrists even months after the shooting.
As the United States Court of Appeals for the Eleventh Circuit stated in Wallace v. Kemp:

*796 "This is not a case in which the psychiatrists relied only upon the defendant's subjective description of his symptoms, see, e.g., Mims [v. United States], 375 F.2d [135,] 145 [(5th Cir. 1967)]; United States v. Makris, 535 F.2d 899, 908 (5th Cir.1976), in which the doctors were unaware of the defendant's legal problems, see, e.g., Mims, 375 F.2d at 145, or in which there was a lack of any history of mental abnormalities. Id. See generally Strickland [v. Francis], 738 F.2d [1542,] 1553 [(11th Cir.1984) ].
"Although the state countered some of the minor grounds upon which the experts relied, their diagnoses were nonetheless based on overwhelming, accurate additional factors. There was insufficient reason, therefore, for the jury to disregard the psychiatrists' testimony."
Wallace v. Kemp, 757 F.2d at 1111.
Finally, relative to the consideration of the first factor regarding the correctness or adequacy of the factual assumptions on which the experts based their opinions, it is highly significant that Russell was declared incompetent to stand trial and that he spent many months in treatment at Taylor Hardin before he was restored to competency.
The record presents no basis on which the jury could have found the experts's factual assumptions to be inadequate or incorrect. Therefore, this factor does not provide a reason for the jury to have disregarded the experts' opinion about Russell's insanity.

2. Possible bias

This factor also provides no reason for the jury to have rejected the experts' testimony. Dr. Pilkinton and Dr. Hooper were employed by the State of Alabama at Taylor Hardin, and their responsibility was to complete court-ordered forensic evaluations and to provide to the court their objective opinions about Russell's competency and mental status at the time of the offense. Neither expert was employed by the defense. The State has made no implication of bias in this case, and the record reflects no bias.

3. Inconsistencies in the experts' testimony or conflict between experts

The State presented no expert testimony. Dr. Pilkinton and Dr. Hooper, Russell's experts, each testified consistently and repeatedly that Russell was suffering from a longstanding severe mental disorder; that at the time of the shooting, the severe mental disease interfered with his ability to appreciate the nature and character of his actions; that Russell was not malingering; and that Russell's actions during and after the shooting were consistent with someone suffering from schizophrenia with paranoid delusions. The record discloses no inconsistencies in the experts' testimony and no conflict between them.
The majority quotes portions of the State's cross-examination of the psychiatrists in which the experts acknowledged that Russell was capable of goal-directed or intentional behavior and that some of the actions Russell took during and after the shooting could be consistent with someone who was not suffering from a mental disease or defect. However, the majority's focus on selected portions of the cross-examination of the experts is misleading. The prosecutor asked the experts numerous hypothetical questions about whether certain actions like Russell's could have been performed by a sane person or whether the actions could have indicated intent or consciousness of guilt. Although the experts acknowledged in their responses to questions that certain actions could have been performed by a sane person, or *797 that it was possible that certain of Russell's actions might have indicated that he was not mentally ill at the time of the shooting, they also consistently and repeatedly testified that based on their years of experience and their observation and testing of Russell, they believed that Russell suffered from a longstanding mental disorder and that he was not sane when he shot Anderson. In fact, Dr. Hooper testified that, although Russell's mental health had improved enough so that he was competent to stand trial, he did not believe that Russell was well enough to be released from Taylor Hardin, and he was "not at all sure" that Russell would ever be well enough to be released from inpatient treatment for his mental illness. (R. 434.)
To the extent the majority implies that the State's cross-examination of the experts regarding hypothetical interpretations of Russell's behavior resulted in contradictions in their testimony about Russell's insanity, warranting the jury's rejection of their expert opinion, such an implication is in conflict with our precedent. In Herbert v. State, 357 So.2d 683 (Ala.Crim.App.1978), after testifying that Herbert was schizophrenic and insane at the time of the offense, the defense experts acknowledged on cross-examination that a person could demonstrate some of the symptoms they had observed in Herbert and the person would not be insane, that schizophrenics can know right from wrong, and that a sane person could give some of the same answers Herbert gave on a psychological tests. However, after reviewing the record in its entirety, this Court held:
"[T]here was apparently nothing before the jury to rebut the great mass of testimony directly showing actual insanity before, at the time of, and after the act in question. In other words, there were simply no facts before the jury from which opposing inferences might have been rationally drawn. Here, the evidence of insanity is not merely strongly persuasive; it is conclusive.
"There was no evidence that the appellant was sane aside from the mere presumption of sanity. The appellant did not take the witness stand and therefore the jury was not afforded the `fruitful opportunity' to form an estimate of his mental condition and to view, in some measure at least, the operations and perceptions of his mind."
Herbert v. State, 357 So.2d at 689-90.
As in Herbert, the record here presented no inconsistencies or contradictions in the experts' testimony, and no basis for the jury to have rejected the expert opinions regarding Russell's insanity.

4. Lay testimony to the contrary

There was no lay testimony contradicting the expert testimony about Russell's insanity.
As for the testimony from witnesses about Russell's actions during the shooting, the majority's recitation of the facts correctly indicates only that two men at the American Legion Post described Russell as a person who did not socialize with others and who shot Anderson with no apparent motive, then walked calmly away from the scene. That Russell had been a member of the American Legion Post for years but did not socialize or mix well with anyone does not amount to testimony establishing Russell's sanity. Moreover, that testimony does not contradict or rebut any of the experts' testimony that Russell was suffering from a mental disease or defect at the time of the shooting and that the mental illness that prevented him from appreciating the nature and character of his actions. See Brock v. United States, 387 F.2d 254, 258 n. 11 (5th Cir.1967) ("[T]here is less force to a statement that *798 nothing abnormal was observed than to a clinically based assertion of insanity. An affirmative proposition is little supported by negative observations."). Nor did testimony that, at the time of his arrest, Russell had just climbed out of the window of the abandoned, boarded-up house he had been living in and was planning to dispose of the gun create a conflict in the testimony. The experts testified that disposing of the gun was entirely consistent with a diagnosis of Russell as a schizophrenic person suffering from paranoid delusions.
Because there was no lay testimony contradicting the expert testimony regarding Russell's insanity, this factor does not provide an objective reasonor any reason for the jury's rejection of the experts' opinion.
In summary, the reasons offered by the majority to uphold the jury's rejection of the overwhelming, consistent expert testimony of Russell's insanity are insubstantial based on an analysis of the entire record and in light of the relevant factors an appellate court must consider when reviewing a jury's decision to reject expert opinion about mental defects or illness. The jury's rejection of the uncontradicted expert testimony was not based on any objective reasons. Russell's conviction could have been sustained only by reliance on the bare statutory presumption that he was sane. That presumption, however, was rebutted by overwhelming and uncontradicted evidence. Therefore, the only reasonable conclusion based on the evidence is that the jury arbitrarily disregarded the expert testimony and opinion and that the conviction based on its verdict should be reversed.
Although I have the utmost respect for the jury's difficult role as factfinder, the jury's role is subject to an appellate court's obligation to exercise supervisory authority to ensure the fair administration of justice and, in this case, to ensure that uncontradicted and overwhelming expert testimony is not arbitrarily disregarded. On the basis of the record, there was no objective reason for the jury to disregard the opinions of the two psychiatric experts who presented clear and convincing evidence that at the time of the shooting Russell suffered from a severe mental disease and that he was unable to appreciate the wrongfulness of his actions. One function of the criminal justice system is to hold individuals accountable for their criminal actions, and the system is essential to protect public safety. However, justice is not served by punishing a man suffering from a mental illness for actions that resulted from his life-long, severe mental illness and over which he had neither comprehension nor control.
Russell's conviction is due to be reversed. Therefore, I must respectfully dissent.
KELLUM, J., concurs.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).